*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

DEGUI CHEN,
*Plaintiff-Appellant*

v.

MICHAEL E. JUNG and CHARLES L. SAWYERS,
*Defendants-Appellees.*

*On Appeal from the United States District Court for the Central District of California,
Case No. 2:18-cv-02015-RGK-KS · Honorable R. Gary Klausner*

# ANSWERING BRIEF OF DEFENDANTS-APPELLEES

MARK M. SUPKO
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 624-2500 Telephone
msupko@crowell.com

GABRIEL M. RAMSEY
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
(415) 986-2800 Telephone
gramsey@crowell.com

EMILY T. KUWAHARA
CHIEMI D. SUZUKI
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071
(213) 622-4750 Telephone
ekuwahara@crowell.com

*Attorneys for Defendants-Appellees Michael E. Jung and Charles L. Sawyers*

 

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Chen     v. Jung

Case No. 2020-1255

### CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☐ (appellant) ☐ (respondent) ☒ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Michael E. Jung, Ph.D. | The Regents of the University of California | None |
| Charles L. Sawyers, M.D. | Samedy Ouk, Ph.D. | |
| | John Wongvipat | |
| | Christopher Tran | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

Crowell & Moring LLP
Gregory D. Call
Dylan Scott Burstein
Sigourney Rosy Haylock

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).

Chen v. Jung, Case No. 2020-1257 (Fed. Cir.)

| March 25, 2020 | /s/ Emily T. Kuwahara |
|---|---|
| Date | Signature of counsel |
| Please Note: All questions must be answered | Emily T. Kuwahara |
| | Printed name of counsel |

cc: _____

Reset Fields

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES.............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 2

STATEMENT OF THE CASE .................................................................. 2

    A.    Procedural History........................................................ 2

    B.    The Evidence at Trial ................................................... 3

        1.    In 2002, Dr. Sawyers and Dr. Jung started the RD-series project............................................................. 4

        2.    In August 2004, Dr. Jung called a meeting specifically to discuss creating new compounds that would be distinct from the RD-series Compounds.................................... 6

        3.    After months of work, Dr. Ouk synthesized A51 by January 2005 ................................................................ 8

        4.    Dr. Ouk gave A51 to Dr. Chen to test, and Dr. Chen told him A51 was inactive .......................................... 10

        5.    In September 2005, Dr. Ouk suspected that A51 may in fact be active, leading to his resynthesis of A51 and conception of A52 ...................................................... 12

        6.    The RD-series and A-series Compounds are conceptually and chemically distinct sets of compounds, and are separately patented .................................................. 13

        7.    Dr. Chen's work on the RD-Series Compounds did not involve the conception of the chemical structure for the inclusion of a left-hand pyridine ring or the inclusion of the three elements of the A-series Compounds..................... 16

    C.    The District Court's Findings of Fact and Conclusions of Law ............... 18

SUMMARY OF ARGUMENT................................................................. 22

ARGUMENT................................................................................. 26

    I.    Legal Standard......................................................... 26

        A.    The District Court's findings of fact may be set aside only for clear error ..................................................... 26

B. Dr. Chen was required to meet a heavy burden of proving his purported inventorship with clear and convincing evidence .......... 27

C. To prove joint inventorship, Dr. Chen needed to present clear and convincing evidence that he collaborated or made concerted efforts with others ........................................................... 29

II. The District Court Did Not Clearly Err in Holding that Dr. Chen Did Not Establish that He is An Inventor on the Basis of His Purported Testing of A51 .................................................................................. 31

A. Dr. Chen failed to present clear and convincing evidence that he ever tested A51 .................................................................. 31

1. A bar chart with a compound labeled "CC1" that Dr. Chen did not share and Dr. Chen's uncorroborated testimony that "CC1" is A51 falls far short of meeting his burden of proof ................................................................. 32

2. The District Court's finding was not clearly erroneous under the rule of reason analysis ......................................... 35

a. The District Court's credibility determinations against Dr. Chen with respect to the events surrounding the testing of A51 are entitled to strong deference ......................................................... 36

b. Dr. Chen's other purportedly "circumstantial" evidence adds nothing to the inventorship analysis ................................................................... 38

B. Even if the District Court erred in finding that Dr. Chen did not prove that he tested A51, he still failed to establish inventorship because the conception of A51 had already occurred .......................................................................................... 41

III. The District Court Did Not Clearly Err in Holding that Dr. Chen's Claims of Developing A Testing System that Was Allegedly Used to Test A51 Was Insufficient to Prove Inventorship of the A-Series Compounds ................................................................................................. 44

A.     The District Court did not clearly err in finding that Dr. Chen did not establish that he developed and designed innovative systems and methods to test the A-series Compounds ................... 45

B.     The District Court did not clearly err in finding that Dr. Chen's alleged development of a novel testing system was not an inventive contribution to the A-series Compounds because it was publicly known when the compounds were conceived ........ 47

IV.    The District Court Did Not Clearly Err in Concluding that Dr. Chen's Alleged Identification of RD37 and RD162 as Lead Compounds Was Insufficient for Inventorship of the A-Series Compounds................................................................................. 49

A.     Dr. Chen failed to establish that he identified any RD-series Compounds as the bases for A-series Compounds or that he came up with the particular combination of elements in the A-series Compounds .......................................................... 50

B.     Dr. Chen presented no evidence of any particular contribution he made to the chemical design of the right-hand side of RD37 or RD162 ............................................................. 54

V.    The District Court Did Not Clearly Err in Holding that Dr. Chen Cannot Be an Inventor of the A-Series Compounds Simply Because of His General Work on the RD-Series....................................................... 56

VI.   On Appeal, Dr. Chen Has Waived His Contention that He Contributed to the Idea of the Pyridine Ring in A51 ................ 58

CONCLUSION ............................................................................. 60

CERTIFICATE OF COMPLIANCE ............................................. 61

CERTIFICATE OF SERVICE........................................................ 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acromed Corp. v. Sofamor Danek Grp.*,
253 F.3d 1371 (Fed. Cir. 2001) ................................................................... 27

*Amax Fly Ash Corp. v. United States*,
514 F.2d 1041 (Ct. Cl. 1975) ...................................................................... 28

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985) ............................................................................. 26, 27

*Bd. of Educ. ex. rel. Bd. of Trustees of Fla. State Univ. v. Am. Biosci., Inc.*,
333 F.3d 1330 (Fed. Cir. 2003) ...................................................... 42, 52, 53

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
40 F.3d 1223 (Fed. Cir. 1994) ........................................ 27, 28, 41, 42, 43

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) ..................................................................... 51

*Eli Lilly & Co. v. Aradigm Corp.*,
376 F.3d 1352 (Fed. Cir. 2004) ........................................................... *passim*

*Falana v. Kent State University*,
669 F.3d 1349 (Fed. Cir. 2012) ........................................................... 45, 46

*Gen. Elec. Co. v. Wilkins*,
750 F.3d 1324 (Fed. Cir. 2014) ........................................................... 27, 28

*Hess v. Advanced Cardiovascular Sys.*,
106 F.3d 976 (Fed. Cir. 1997) ..................................................................... 28

*Intercept Pharms., Inc. v. Fiorucci*,
277 F. Supp. 3d 678 (D. Del. 2017) ...................................................... 41, 44

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
424 F.3d 1324 (Fed. Cir. 2005) ................................................................... 27

*Linear Tech. Corp. v. Impala Linear Corp.*,
379 F.3d 1311 (Fed. Cir. 2004) ...................................................... 28, 29, 32

*Pannu v. Iolab Corp.*,
155 F.3d 1344 (Fed. Cir. 1998)............................................................21, 30, 49

*Pentec, Inc. v. Graphic Controls Corp.*,
776 F.2d 309 (Fed. Cir. 1985)......................................................................... 26

*Price v. Symsek*,
988 F.2d 1187 (Fed. Cir. 1993)....................................................................... 27

*Rentrop v. Spectranetics Corp.*,
550 F.3d 1112 (Fed. Cir. 2008)..................................................................54, 55

*Singh v. Brake*,
317 F.3d 1334 (Fed. Cir. 2003)..................................................................29, 34

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)....................................................................... 59

*Starr Int'l Co., v. United States*,
856 F.3d 953 (Fed. Cir. 2017)......................................................................... 26

*Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*,
573 F.3d 1290 (Fed. Cir. 2009)..................................................................43, 44

*Vanderbilt Univ. v. ICOS Corp.*,
601 F.3d 1297 (Fed. Cir. 2010)..................................................................34, 52

*In re Verhoef*,
888 F.3d 1362 (Fed. Cir. 2018)....................................................................... 56

**Statutes**

35 U.S.C. § 116 .....................................................................................29, 30, 40

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action was previously before this Court or any other appellate court.  This appeal is related to *Degui Chen v. Michael E. Jung, et al.*, Case No. 2:19-cv-04307-R-KS ("*Chen II*"), which is pending as an appeal before this Court, Case No. 20-1257.  The Court deemed *Chen II* and the instant appeal companion cases, and they will be heard together.  [Dkt. 14.]

## STATEMENT OF THE ISSUES

1.  Whether the District Court clearly erred in finding as a factual matter that Dr. Chen did not significantly contribute to the invention of any claim of the A-series Patents, where the evidence showed that, at most, he helped develop a cell testing system that was only used to confirm the efficacy of the novel chemical compounds conceived by the name inventors.

2.  Whether based on its factual findings, the District Court correctly held that Dr. Chen did not prove by clear and convincing evidence that he is a joint inventor of any claim of the A-series Patents.

## STATEMENT OF THE CASE

### A.  Procedural History

On March 12, 2018, Dr. Chen filed his Complaint in the U.S. District Court for the Central District of California, seeking the issuance of an order to correct inventorship to enable him to be added as a joint inventor of the patents-at-issue, U.S. Patent Nos. 8,445,507; 8,802,689; and 9,388,159 (collectively, the "A-series Patents"), which include, *inter alia*, claims to the chemical compounds known as A51 and A52 (collectively, the "A-series Compounds").  Appx0099-0100 [Dkt. No. 1].

On October 15 and 16, 2019, the District Court held a bench trial on the question of whether Dr. Chen contributed to the invention of A51 and A52.

Appx0128 [Dkt. Nos. 239, 240].

On November 6, 2019, the District Court rendered its decision in favor of Drs. Jung and Sawyers, holding that Dr. Chen had failed to prove by clear and convincing evidence that he was a joint inventor for any claim of the A-series Patents. Appx0001-0008. The District Court then entered Final Judgment on November 8, 2019 (Appx0009-0010), after which Dr. Chen initiated this appeal.

## B. The Evidence at Trial

During the bench trial on the question of Dr. Chen's alleged inventorship regarding the A-series Compounds, the District Court heard testimony from fact witnesses Dr. Chen, Dr. Sawyers, Dr. Jung, Dr. Samedy Ouk, and John Wongvipat. *See* Appx0133, Appx0340, Appx0465 [Index of Witnesses]. Dr. Sawyers, Dr. Jung, Dr. Ouk, and Mr. Wongvipat (along with Chris Tran who did not testify), are the named inventors of the A-series Patents. *See* Appx0011 ['507 Patent Listing Inventors]. The District Court also heard expert testimony from Dr. Sawyers on cancer research tools and methodologies, cancer treatments, oncology and biology (Appx0450); from Plaintiff's expert Dr. Ron Bihovsky on the topics of chemistry and drug discovery (Appx0363-0363); and from Defendants' expert Dr. Jeffrey Winkler regarding organic and medicinal chemistry and drug research and development (Appx0475-0476).

The sections below highlight key trial testimony that underlies the District

Court's findings of fact and its ultimate conclusion of law that Dr. Chen failed to prove he is a co-inventor of the A-series Patents.

**1.    In 2002, Dr. Sawyers and Dr. Jung started the RD-series project.**

In the summer of 2002, Drs. Sawyers and Jung began to discuss the development of new chemical compounds for use in prostate cancer treatment. Appx0422.  Dr. Jung was then and is still a UCLA professor of organic chemistry. Appx0422.  Dr. Sawyers is currently the chair of the human oncology and pathogenesis program at Memorial Sloan Kettering Cancer Center, but during the relevant time, he was a UCLA professor of medicine, pharmacology, and urology. Appx0443-0444.  Dr. Jung hired Dr. Ouk to work in his lab as a post-doctoral researcher in January 2003.  Appx0423.  Dr. Chen worked in Dr. Sawyers's lab. Appx0444.

The drug discovery process for the first series of compounds, called the "RD-series Compounds," started with a compound called RU59063, made by the company Roussel Uclaf, that binds very strongly to the androgen receptor. Appx0423.  In developing the RD-series Compounds, the chemists, Dr. Ouk and Dr. Jung, drew new structures and synthesized the compounds.  Appx0423. Biologists in Dr. Sawyers's lab, including Dr. Chen, tested the RD-series Compounds to assess their biological activity.  Appx0423.  Following this testing, the team of chemists and biologists met to examine the test results and discuss the

relationship between the chemistry of the new compounds and the observed biological activity. Appx0423-0424, Appx0309. Based on those data and discussions, they generated new compounds. Appx0424. This active collaboration and joint analysis between the chemists and the biologist were maintained throughout the RD-series project. *See* Appx0309, Appx0423.

This collaborative effort between the chemists and the biologists on the team, which involved jointly discussing relationships between chemical structure and biological results and consequent changes in chemical groups to achieve better activity, is called the "structure activity relationship" process (also called "SAR"). Appx0424. In addition to testing, Dr. Chen actively participated in these SAR meetings and group discussions about the test results, and analyzed the SAR after test results were obtained. Appx0274-0275, Appx0422-0424, Appx0309-0310.

Work on the RD-series eventually resulted in the discovery of an active RD-series Compound that led to a ground-breaking prostate cancer drug. *See* Appellant's Opening Brief "AOB" at 4-5. Dr. Chen, with others, is a named inventor on the patents that cover the RD-series Compounds. *Id.* The RD-series Compounds are not covered by any claims of the A-series Patents. Appx0249-0250, Appx0476, Appx0482.

**2.    In August 2004, Dr. Jung called a meeting specifically to discuss creating new compounds that would be distinct from the RD-series Compounds.**

On August 31, 2004, Drs. Jung, Sawyers, Ouk, and Chen attended a meeting to discuss the development of new chemical structures, distinct from the RD-series Compounds.  Appx0427-0428, Appx0396-0398.  As summarized by the District Court, "[d]uring the August 31, 2004 meeting, Drs. Jung and Ouk proposed making a chemical compound consisting of (1) a left-hand pyridine ring (a ring with a nitrogen atom); (2) a central spirocyclic thiohydantoin; and (3) a right-hand aryl ring."  Appx0002-0003, *see* testimony at Appx0322-0325, Appx0352-0354, Appx0397-0402, Appx0426-0429, Appx0445-0446.

The A-series Compounds are chemically distinct from those of the RD-series Compounds.  Unlike the RD-series Compounds, the A-series Compounds have a left-hand pyridine ring (a type of "heterocyclic" ring) with a nitrogen on top (pictured below) instead of a benzene ring.  Appx0428, Appx0476, Appx0482-0489.

//

//

Appx0023 (emphasis added).

This change to a left-hand pyridine ring for the A-series Compounds was a significant and novel change. Dr. Jung explained that although the change from a benzene ring on the left-hand side to a pyridine ring looks simple, with a change of a "CH bond to an N, everything in the ring changes. It's not a simple change. It's a very distinct change. Bond angles change. Bond lengths change. The polarity changes. Benzene has a zero dipole moment. Pyridine has a very strong dipole moment." Appx0435-0436. In particular, Dr. Jung believed that having a lone pair of electrons on the nitrogen in the pyridine ring (as found in the A-series Compounds) would provide "additional binding and make a better compound" than the benzene ring-containing RD-series Compounds. Appx0436.

At trial, in testimony at odds with the testimony from all other fact witnesses, Dr. Chen claimed that he proposed the idea of modifying the left-hand

ring at the August 2004 meeting, and that he specifically proposed using a pyridine ring as the left-hand ring of a RD-series Compound called RD37 at a lunch meeting in October 2004 with Dr. Ouk. Appx0213. Dr. Chen admitted to having no documentation or other corroborating evidence of his claim that he made these proposals. Appx0253-0254.

### 3. After months of work, Dr. Ouk synthesized A51 by January 2005.

Coming up with a synthesis route to make the first compound of the A-series Compounds, now called A51, took the chemists (Dr. Jung and Dr. Ouk) about three months. Appx0325-0331, Appx0406-0408, Appx0430, Appx0430-0433. Dr. Ouk described A51 as the "most difficult compound that [he] made in Jung's lab." Appx0407. It was so difficult that while trying to develop a synthesis route with Dr. Jung, Dr. Ouk blew up the lab's microwave. Appx0407. Nevertheless, the chemists persisted.

Both Dr. Jung and Dr. Ouk had a rationale for believing that A51 would be a biologically active compound. Dr. Jung memorialized his rationale in a handwritten document that he gave to Dr. Ouk sometime after the August 31, 2004 meeting. *See* Appx0429. The document had drawings of several compounds, including a compound labeled "A," which was a "general structure of the molecules of the A-series." Appx0652-0653 [TX28], Appx0429-0430. The document reflected Dr. Jung's belief that changing the left-hand benzene ring in

the RD-series Compounds to a pyridine ring for the A-series would make a more polar molecule, which would "bind better in the central cavity [of the androgen receptor] that we were trying to inhibit." Appx0430. He wrote,

> [t]he [first] five [compounds] should be much more polar (they have lower cLogP)[1] [and] could have additional binding interactions since there is a [water] molecule in the binding site (additional [hydrogen] bonding).

Appx0652. Dr. Jung testified that he never discussed with Dr. Chen different molecules to make, the rationales for these molecules, or a method of making A51. Appx0431, Appx0433.

Dr. Ouk had his own rationale for why A51 might be a viable compound, which he later memorialized in an email to Dr. Sawyers. Appx1872-1873 [TX138], Appx0400-0402. Dr. Ouk explained that other chemists may have believed that the use of a pyridine ring would be a "liability" in this new molecule because it could make the molecule hydrophilic (*i.e.*, have a tendency to dissolve in water). Appx0400. But, because A51 contained "two-electron withdraw[ing] group[s], [a] cyano group and trifluoromethyl group," he "believe[d] that the presence of [the] two electron withdraw[ing] group[s] would pull out the lone pair electron [in the nitrogen atom] in the pyridine . . . ." Appx0400-0401. Dr. Ouk

---

[1] cLogP is described by Dr. Winkler as a measurement that shows how likely a molecule is to dissolve in gasoline instead of dissolving in water. Appx0484-0485.

testified that Dr. Chen made no contribution to this rationale.  Appx0402.

### 4. Dr. Ouk gave A51 to Dr. Chen to test, and Dr. Chen told him A51 was inactive.

After Dr. Ouk synthesized A51, he gave the compound to Dr. Chen to test for biological activity.  Appx0410.  Having not received any testing data, by about early February 2005, Dr. Ouk asked Dr. Chen about the testing.  Appx0410.  Dr. Chen did not tell him the test results.  Instead, Dr. Chen told Dr. Ouk "to destroy the notebook and conceal the evidence that A51 [was] ever made and conceal [*sic*] at UCLA."  Appx0410-0411, *see also* Appx1872 [TX138].

Dr. Ouk considered Dr. Chen his best friend and was upset by Dr. Chen's unethical request.  Appx0412-0413.  He responded, "let me think about that."  Appx0411-412.  Angry, Dr. Chen threatened not to test any more of Dr. Ouk's molecules, and the pair did not speak for a few days.  Appx0412.

About a week later, Dr. Chen told Dr. Ouk that the compound with the pyridine ring was not active.  Appx0410-0412.  Dr. Ouk was relieved to hear that the A-series was inactive, as it made the notebook incident a non-issue, and the pair reconciled.  Appx0410-0412.  Dr. Ouk never destroyed any of his UCLA lab notebooks.  Appx0412.  Dr. Ouk never knew for sure whether Dr. Chen ever tested A51.  Appx0410.  Dr. Ouk then turned his attention back to the RD-series Compounds.  Appx0410-0412.

Around the same time as Dr. Ouk's inquiry, Dr. Jung also asked Dr. Chen

about the status of the pyridine compound (A51), and Dr. Chen told Dr. Jung that it was "bad, it's no good." Appx0434. Dr. Jung was surprised because he thought there was a good rationale for why it should be active, and he was disappointed to hear that the new compound did not work. Appx0434-0435.

Dr. Chen testified that he did not record any test results relating to A51 in his UCLA lab notebooks. Appx0259-0265. Though Dr. Chen testified that he told Dr. Ouk about the A51 test results (Appx0266) (which Dr. Ouk denies, Appx0410-0411), Dr. Chen also admitted that he did not share with anyone his thoughts about what to do next, did not disclose the results to UCLA's technology transfer office, did not share the test results with Dr. Sawyers, and did not discuss the test results at any of the lab meetings. Appx0267.

Dr. Chen argues now that assay results from February 2005 involving a compound labeled "CC1" are purportedly his test results regarding A51. Dr. Ouk testified that he never heard Dr. Chen talk about a compound called "CC1." Appx0412. After purportedly running the assay on CC1, and purportedly getting results showing good biological activity, Dr. Chen testified that he inexplicably set the results aside and simply went back to work on the RD-series Compounds until he resigned from UCLA in September of 2005. Appx0267.

As a result of Dr. Chen's reporting of bad results, no further work was done on the A-series project until October 2005, after Dr. Chen had resigned from

UCLA.  Appx0413-0416.

> **5.    In September 2005, Dr. Ouk suspected that A51 may in fact be active, leading to his resynthesis of A51 and conception of A52.**

Dr. Chen left UCLA in September 2005, and returned to China.  Appx0237, Appx0267.  Shortly thereafter, Dr. Ouk began to work on a summary report of his own work.  Appx0413-0416.  He wanted to include A51 in his report because he was proud of synthesizing such a difficult compound.  Appx0413-0414.  He looked for his nuclear magnetic resonance ("NMR") spectrum for A51 that he generated when he synthesized A51, but he could not find it.  Appx0414-0415.  The NMR spectrum provides a written record of the structure of the molecule.  *See* Appx0409.  Dr. Ouk's labmates told him that they saw Dr. Chen looking around in Dr. Ouk's notebooks.  Appx0414-0415.  Putting "A and B together," Dr. Ouk began to suspect that A51 could be active.  *Id.*

Newly concerned about Dr. Chen's behavior, Dr. Ouk disclosed the events involving A51, including Dr. Chen's improper request to destroy lab notebooks, in a letter to Dr. Sawyers, and then later to Dr. Jung and in a formal memo.  Appx0318-0319, Appx0413-0416, Appx0435, Appx0647-0650 [TX18], Appx0637 [TX13], Appx1872-1873 [TX138].  Dr. Ouk synthesized another sample of A51 and had it tested to confirm his and Dr. Jung's original belief that A51 would be active.  Appx0417-0418.

In the letter to Dr. Sawyers, dated October 27, 2005, Dr. Ouk also drew the chemical structure of A52. Appx1872-1873, Appx0416-0417. A52 combines a left-hand pyridine ring, a hallmark of the A-series Compounds, with the central spirocyclic thiohydantoin ring and right-hand aryl ring that are common to RD162, one of the compounds of the RD-series. Appx0478-0483. Dr. Ouk testified that the structure of A52 was his own idea and that Dr. Chen never suggested combining a left-hand pyridine ring with any of the substituents of RD162. Appx0417.

Eventually, A52 became the active ingredient in another ground-breaking prostate cancer drug, ERLEADA®. Appx0140. Multiple patent applications related to the A-series Compounds were filed, leading to issuance of the three A-series Patents at issue in this case. Appx0477, Appx0011-0095. Dr. Chen is not a named inventor on any of the A-series Patents. Appx0011 at (75); Appx0040 at (75); Appx0068 at (72).

### 6. The RD-series and A-series Compounds are conceptually and chemically distinct sets of compounds, and are separately patented.

Defendants' expert Dr. Winkler, who was qualified as "an expert in the fields of organic and medicinal chemistry and in the field of drug research and development" (Appx00476), provided unrebutted testimony about the distinct differences between the RD-series and A-series Compounds. Appx0476,

Appx0482-0489.  Even Dr. Chen admitted that the RD-series Compounds are covered by a separate set of patents not involved in this case and are "independent from" the patents at issues in this case.  Appx0249-0250.

As Dr. Winkler, Dr. Ouk and Dr. Jung explained, the A-series Compounds have a heterocyclic ring (in particular, a pyridine ring) on the left, a spirocyclic thiohydantoin in the middle, and an aryl ring (*i.e.*, a ring that contains only carbon atoms) on the right.  Appx0480-0081, Appx0398-0399, Appx0426-0428.  A heterocyclic ring means that the ring contains one or more atoms that are not carbon atoms.  Appx0481.  In the A-series Compounds, the left-hand pyridine ring—a heterocyclic ring—has a nitrogen atom at the top.  Appx0023.  In contrast to the A-series Compounds, the RD-series Compounds have an aryl ring (*i.e.*, a ring that contains only carbon atoms) on both the left and the right sides of the molecules.  Appx0482-0483.

Dr. Winkler testified that the change in the left-hand ring between the two series would result in "strikingly different properties," such that the A-series Compounds are not properly considered a subset of the RD-series.  Appx0482-0483.  For example, molecular orbitals, the polarity of the molecules, how hydrophobic or hydrophilic (how likely to dissolve in water) the molecules are, boiling point, melting point, and the topological polar surface area ("tPSA" or the measure of how easily compounds get into cells) are very different.  Appx0483-

0488. Dr. Winkler's testimony can be summarized in the following chart:



**Differences Between Benzene and Pyridine**

| | Structure | Molecular orbitals | Polarity | Hydrophobicity | Boiling point | Melting point | tPSA |
|---|---|---|---|---|---|---|---|
| Benzene | | | 0 D | 2.13 | 80°C | 5.5°C | 0 |
| Pyridine | | | 2.2 D | 0.73 | 115°C | -42°C | 12.36 |

Dr. Winkler testified that these differences in properties could result in very different overall properties between the A51 and A52 compounds, on the one hand, as compared with the RD-series Compounds, on the other hand. Appx0488-0489. Dr. Chen did not try to rebut this testimony.

Based on this unrebutted evidence, the District Court found that the RD-series Compounds are a conceptually and chemically distinct set of compounds that are separately patented from the A-Series Compounds at issue here. Appx0002.

### 7. Dr. Chen's work on the RD-Series Compounds did not involve the conception of the chemical structure for the inclusion of a left-hand pyridine ring or the inclusion of the three elements of the A-series Compounds.

The evidence at trial showed that the conception of the A-series Compounds sprang from the innovative decision to combine a left-hand pyridine ring, a central spirocyclic thiohydantoin, and a right-hand aryl ring. Appx0480-0481, Appx0398-0399, Appx0426-0428. Dr. Winkler testified that to get from the RD-series Compounds to the A-series Compounds required "an inventive or eureka moment of replacing the benzene ring with a pyridine [ring] that went way beyond the structure, the body of structure activity relationship data that was available from the RD-series. Without that innovation, without that invention, one could not have arrived at the A-series compounds." Appx0489. In other words, Dr. Chen's knowledge of the structure of the RD-series Compounds, even if informed by the related SAR information for those compounds, was insufficient to lead someone to invent the A-series Compounds. *See id.*

Moreover, Dr. Chen lacked an understanding of key chemistry principles that Dr. Winkler testified were necessary to invent the A51 and A52 compounds. Appx0476, Appx0489-0491. Dr. Chen even admitted that he did not understand key features of the invention, such as whether the nitrogen atom would be better suited at the top or bottom position of the pyridine ring of A51 and A52, or fundamental differences regarding pyridine versus benzene rings such as the

presence or absence of a lone electron pair, which compound is more basic, and differences or similarities in reactivity and polarity. Appx0269-0271.

The path to invention of the A-series Compounds was completely different from that of the RD-series Compounds. Appx0426. The testimony established that chemists Dr. Jung and Dr. Ouk conceived the particular combination of elements in the A-series Compounds. Appx0397-0402, Appx0417, Appx0426-0429, Appx0445-0446, Appx0322-0325, Appx0352-0354. The conception of both A51 and A52 did not involve a SAR process or iterative and collaborative discussions between the chemists and biologists, such as Dr. Chen. Appx0425-0426, Appx0266-0267.

Consistent with this different invention process compared to the collaborative process that led to the invention of the RD-series Compounds, Dr. Chen conceded that he had no notes showing the structure of A51 or A52, their particular combination of elements, any drawings showing the structure of any compounds with a left-hand pyridine ring, or any evidence that he discussed or memorialized how to make compounds with a left-hand pyridine ring. Appx0245-0247, Appx0257-0258, Appx0265. Dr. Chen's expert witness, Dr. Bihovsky, conceded that Dr. Chen presented no documentary evidence showing that he contributed to the design of A51. Appx0382.

## C.    The District Court's Findings of Fact and Conclusions of Law

On November 6, 2019, the District Court issued its Order and Judgment re:

Bench Trial.  Appx0001.  In its analysis, as a threshold matter, the District Court

noted that Dr. Chen "did not identify *any* patent claim to which he contributed."

Appx0005 (emphasis in original).  Instead, Dr. Chen generally argued that he was

entitled to joint inventorship because he allegedly made four contributions to the

development of the A-series Patents:  (1) he proposed the pyridine substitution

with Dr. Ouk[2]; (2) he identified RD37 and RD162 as lead compounds as the bases

to make A51 and A52; (3) he developed a novel testing system to test the A-series

Compounds; and (4) he tested A51 using his novel testing system.  Appx0005.

With respect to each of these four alleged contributions, the District Court

made the following findings:

(1)  Regarding the pyridine substitution, the District Court found "that

Plaintiff has not established that he proposed the pyridine substitution."

Appx0006.  The District Court first found that Dr. Chen offered insufficient

evidence to prove that he proposed to change RD37's left-hand benzene ring to a

pyridine ring.  Appx0005.  In doing so, the District Court pointed to Dr. Chen's

admission that he had no notes from either the August or October 2004 meetings

---

[2] On appeal, Dr. Chen appears to have abandoned this basis for his
inventorship claim.

where he claimed to have made this proposal. *Id.* Nor did he have any documents showing that he made this suggestion, *i.e.*, no notes showing that he wrote down a left-hand pyridine structure, or suggested adding a pyridine ring to RD37. *Id.*

(2) Regarding the alleged identification of RD37 and RD162 as the bases to make A51 and A52, the District Court found "that Plaintiff has offered insufficient evidence that he contributed to the conception of the A-series Patents by identifying RD37 and RD162 as the lead compounds for A51 and A52." Appx0006. The District Court first found that Dr. Chen "offered no independent, contemporaneous corroborating evidence that he identified RD37 and RD162 as bases for the A-series Compounds." *Id.* The District Court then held that even if he had, this would be insufficient to establish inventorship because the conception of a chemical compound required "both knowledge of a specific chemical structure of the compound and operative method of making it," and simply identifying potential bases for a compound "d[id] not, without more, constitute conception." *Id*.

(3) Regarding the alleged development of a novel testing system to test the A-series Compounds, the District Court found "that Plaintiff has not established that he developed and designed innovative systems and methods to test the A-series Compounds." Appx0007. In reaching this finding, the District Court relied on Dr. Chen's admission that the patents that cover the *RD-series* Compounds also

disclose the testing system that Dr. Chen claims to have developed. *Id.* In addition, Dr. Chen "offered no independent, contemporaneous corroborating evidence that he developed a PSA ELISA study to test the A-series Compounds. To the contrary, Dr. Sawyers offered expert testimony that the PSA ELISA study cited by Plaintiff was publicly known by 2005." *Id.*

(4) Regarding Dr. Chen's alleged testing of A51, the District Court found "that Plaintiff has not established that he tested A51." Appx0008. In reaching this finding, the District Court found that Dr. Chen "offered no independent, contemporaneous corroborating evidence of his alleged contribution" of testing A51 and further held that "[e]ven if Plaintiff had made this showing, this alone would be insufficient to confer inventorship" because the testing was merely confirmatory of Dr. Jung and Dr. Ouk's theories regarding A51. *Id.* The District Court noted, "neither Plaintiff's lab notebooks nor any other documents establish that Plaintiff tested the compound which would later be known as A51." Appx0007. The only test results that existed were labeled "CC1" and "Plaintiff has offered no evidence—aside from his own testimony—establishing that CC1 is the same compound" as A51, and he admitted that he had no notes connecting CC1 to A51. *Id.* In doing so, the District Court rejected Dr. Chen's argument that a June 22, 2005 email from Dr. Ouk corroborated that Dr. Chen tested A51, finding that even if the email were discussing A51, the email did not establish that *Dr.*

*Chen* tested A51. *Id.*

In addition to these four alleged contributions, the District Court also considered and rejected Dr. Chen's broad assertion "that he must be an inventor of the A-series Patent because but-for the work Plaintiff did on the RD-series compounds, the A-series Compounds would not have been possible," stating, "Plaintiff's involvement in the RD-series compounds, without more, does not make him a joint inventor of the A-series Patents." *Id.*

In sum, the District Court found, "[i]n light of the absence of any evidence that Plaintiff significantly contributed to *the compounds at issue in this case* . . . , Plaintiff did not 'contribute in some significant manner to the conception or reduction to practice of the invention.' *Pannu*, 155 F.3d at 1351." *Id.* In other words, the District Court found that Dr. Chen did not contribute to the particular, distinct A-series Compounds at issue in this case, which sprung from the inventive decision to combine a left-hand pyridine ring with a central spirocyclic thiohydantoin and a right-hand aryl ring. Appx0001-0003, Appx0006, Appx0008. Dr. Chen's involvement in the RD-series Compounds did not make him an inventor of the A-series Compounds. *Id.*

Finally, having made those findings, the District Court held "that Plaintiff has not shown by clear and convincing evidence that he is a joint inventor of the A-series Patents." Appx0008. The District Court entered Judgment in favor of

Defendants and against Dr. Chen. Appx0008, Appx0009-0010. Dr. Chen then appealed.

## SUMMARY OF ARGUMENT

After weighing the testimony and documentary evidence presented at trial, the District Court determined that Dr. Chen failed to present clear and convincing evidence that, as a factual matter, he made a significant contribution to any of the inventions claimed in the A-series Patents, and that he therefore was not, as a matter of law, a co-inventor. The District Court's findings of fact were supported by the overwhelming weight of the evidence, and compelled its legal conclusion rejecting Dr. Chen's inventorship claim.

Far from identifying any clear error in the District Court's findings of fact, Dr. Chen confusingly muddles together the RD-series and A-series Compounds, and the testing system that was used to test them, to argue that his contributions to the earlier RD-series inventions means that he is also an inventor of inventions claimed in the A-series Patents. The District Court was correct to focus on the specific innovations that distinguished the separately patented A-series Compounds from the earlier RD-series Compounds, and in finding that Dr. Chen failed to meet his burden of proving that he made a "not insignificant contribution" to those innovations by clear and convincing evidence. Dr. Chen essentially asks this Court to re-weigh the evidence and find his uncorroborated testimony more

credible than that of the other witnesses, but without the benefit of hearing and seeing those witnesses first-hand as the District Court was able to do. Dr. Chen has failed to identify any reversible error in the decision below.

Carefully examining each of Dr. Chen's actions and purported contributions, the District Court correctly held that none warrant the addition of Dr. Chen as a joint inventor on the A-series Patents.

*First*, the District Court did not err in holding that Dr. Chen's purported testing of A51 is insufficient to make him a joint inventor. Dr. Chen identifies no clear error in the District Court's findings of fact that Dr. Chen has not established that his testing of "CC1" constitutes testing of A51. Nothing in the additional circumstantial evidence that Dr. Chen points to demonstrates clear error in the District Court's factual findings. As such, the District Court correctly concluded that Dr. Chen failed to prove by clear and convincing evidence that he tested A51 or communicated any results of his purported testing to anyone else.

Moreover, even if Dr. Chen could show that his testing of "CC1" constitutes testing of A51, the District Court correctly held that the testing itself would have been merely confirmatory of the named inventors' rationale regarding the efficacy of the new compounds they conceived, and thus was not itself part of the conception of those compounds. Testing a chemical compound invented by others

in order to confirm the inventors' theory about how the compound would work does not make Dr. Chen an inventor of the A-series Patents, as a matter of law.

*Second*, the District Court did not err in holding that Dr. Chen's design and development of a testing system, which is separately patented, is insufficient to make him an inventor of the A-series Patents. Dr. Chen failed to establish that his testing systems have any relationship to any A-series Patent claims. This testing system was also publicly known by the time Dr. Chen contends that he used it to test A51.

*Third,* the District Court did not err in concluding that Dr. Chen's uncorroborated contention about his alleged identification of RD37 and RD162 as lead compounds of the RD-compounds was insufficient to make him a joint inventor of the A-series Patent. Dr. Chen identifies no clear error in the District Court's finding that Dr. Chen "offered no independent, contemporaneous corroborating evidence that he identified RD37 and RD162 as bases for the A-series compounds." Appx0006. Dr. Chen's argument that he should be a joint inventor because he was an inventor on the RD-series Patents, which *inter alia*, claim the chemical structure of various RD-series Compounds, failed because without more, the Court could not infer that inventorship of one set of claimed compounds meant that Dr. Chen contributed to the conception of another set of patented compounds. To the extent Dr. Chen has shown anything at all, it is that

his work on the RD-series Compounds may have been part of the inspiration for later work, which is not the test for the conception of a chemical compound.

*Fourth*, the District Court properly rejected Dr. Chen's arguments relating to his claim to inventorship based on the general significance of his contribution to the RD-series Compounds. Dr. Chen's claims are untethered to any particular claim of the three A-series Patents. The District Court's finding is sound: "In light of the absence of any evidence that Plaintiff significantly contributed to *the compounds at issue in this case*, the Court finds that Plaintiff did not 'contribute in some significant manner to the conception or reduction to practice of the invention." Appx0008. Moreover, Dr. Chen's sweeping assertions about his contributions to the RD-series Compounds are at odds with the District Court's reasoned findings of fact, for which Dr. Chen has identified no clear error warranting reversal.

Having identified no clear error in the District Court's factual findings, the District Court's ultimate holding "that Plaintiff has not shown by clear and convincing evidence that he is a joint inventor of the A-series Patents" was compelled by the facts of this case. *See* Appx0008. The judgment should be affirmed.

## ARGUMENT

## I.     Legal Standard

### A.     The District Court's findings of fact may be set aside only for clear error.

Though Dr. Chen recites the correct standard of review of clear error for factual findings and *de novo* review for legal holdings, throughout his brief, Dr. Chen ignores the overwhelming evidence supporting the District Court's findings of fact, without demonstrating clear error by the District Court.

To show clear error, as the Appellant, Dr. Chen bears the burden to do more than simply dispute the District Court's findings of fact.  *See Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313, 318 (Fed. Cir. 1985).  Clear error requires more than a suggestion that a different conclusion could have been reached—the District Court's findings must be so erroneous that this Court is "left with the definite and firm conviction that a mistake has been committed." *Starr Int'l Co., v. United States*, 856 F.3d 953, 973-74 (Fed. Cir. 2017) (citation omitted).  Even if this Court may have weighed the evidence differently, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court may not reverse.  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565, 573-75 (1985).

The District Court also made implicit credibility determinations in its resolution of the conflicting testimony and evidence that Dr. Chen fails to

acknowledge.  Those credibility determinations are entitled to strong deference.

*See Gen. Elec. Co. v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir. 2014).  Indeed,

"credibility determinations by the trial judge can virtually never be clear error."

*JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1334 (Fed. Cir.

2005) (citation and quotation omitted).  This is because "only the trial judge can be

aware of the variations in demeanor and tone of voice that bear so heavily on the

listener's understanding of and belief in what is said."  *Anderson*, 470 U.S. at 575.

### B. Dr. Chen was required to meet a heavy burden of proving his purported inventorship with clear and convincing evidence.

As the challenger, Dr. Chen had a heavy burden of proving that he was an

inventor by clear and convincing evidence to overcome the presumption that the

named inventors are the true and only inventors.  *See Acromed Corp. v. Sofamor*

*Danek Grp.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001).

To meet this high burden, because conception is a "mental act, courts require

corroborating evidence of a contemporaneous disclosure that would enable one

skilled in the art to make the invention."  *Burroughs Wellcome Co. v. Barr Labs.,*

*Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) (citation omitted).  Thus, a purported

inventor's testimony "cannot, standing alone, rise to the level of clear and

convincing proof."  *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993); *see*

*Acromed Corp.*, 253 F.3d at 1379 (citing *Price*, 988 F.2d at 1194).  Instead, "the

inventor must prove his conception by corroborating evidence, preferably by

showing a contemporaneous disclosure." *Burroughs Wellcome*, 40 F.3d at 1228.

This strict standard requiring corroboration "rests on important policy considerations." *Hess v. Advanced Cardiovascular Sys.*, 106 F.3d 976, 980 (Fed. Cir. 1997). This Court has observed that these rules are designed to address the risk of "claims of co-inventorship made after a patent has been issued—particularly where, as here, the patent has been outstanding for a considerable time and the patented device has been successful." *Id.* "[T]he temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier, is simply too great to permit a lower standard." *Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 1047 (Ct. Cl. 1975).

Dr. Chen argues that under the "rule of reason" analysis, he met his burden of proof with circumstantial evidence, but he is incorrect. The rule of reason does not lower Dr. Chen's burden of proof. For the rule of reason to even apply, "there must be some evidence that a fact-finder can find reasonable; the putative inventor must first provide credible testimony that only then must be corroborated." *Gen. Elec. Co.*, 750 F.3d at 1330.

Once applied, the rule of reason requires an "evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Linear Tech. Corp. v. Impala Linear Corp.*, 379

F.3d 1311, 1327 (Fed. Cir. 2004) (citation omitted).  The "'rule of reason' analysis does not alter the requirement of corroboration of an inventor's testimony."  *Singh v. Brake*, 317 F.3d 1334, 1341 (Fed. Cir. 2003) (citation omitted).  It remains the case that "[r]eliable evidence of corroboration preferably comes in the form of records made contemporaneously with the inventive process."  *Linear Tech Corp.*, 379 F.3d at 1327.  Circumstantial evidence should also be "of an independent nature."  *Id.*

In other words, the rule of reason does not alter the fundamental requirement that at trial, Dr. Chen was required to meet his burden of proof by clear and convincing evidence comprising something other than his own uncorroborated testimony.

> **C.    To prove joint inventorship, Dr. Chen needed to present clear and convincing evidence that he collaborated or made concerted efforts with others.**

Dr. Chen also attempts to lower the bar for proving his inventorship claim by diluting the requirements to show *joint* inventorship.  But, again, the requirements of joint inventorship do not alter Dr. Chen's burden to prove by clear and convincing evidence that he contributed to the conception of at least one claim in each of the A-series Patents to which he sought to be added as an inventor.

Importantly, to qualify as a joint inventor under 35 U.S.C. § 116(a), a person must "contribute in some *significant* manner to the conception" of an invention,

"make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention," and "do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998) (citations omitted) (emphasis added).

Contrary to Dr. Chen's arguments that attempt to redefine the "joint" aspect of "joint inventorship," an incomplete idea that remains uncommunicated to the named inventors is insufficient to confer joint inventorship. Joint inventorship requires collaboration or concerted effort:

> [An] alleged joint inventor . . . must demonstrate that his labors were conjoined with the efforts of the named inventors. Joint inventorship under [35 U.S.C.] section 116 can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts . . . .

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359-64 (Fed. Cir. 2004).

In sum, Dr. Chen's attempts to lower his burden for proving inventorship fail. He has not identified any clear error in the District Court's factual findings. The District Court's holding that Dr. Chen failed to meet his burden of clear and convincing proof is primarily based on the insufficiency of Dr. Chen's uncorroborated testimony, as well as implicit credibility findings against Dr. Chen, and Dr. Chen's failure to identify his contribution specifically to the inventions

covered by the claims of the A-series Patents. The District Court's factual findings

compel the conclusion that Dr. Chen is not an inventor of the A-series Patents.

**II. The District Court Did Not Clearly Err in Holding that Dr. Chen Did Not Establish that He is An Inventor on the Basis of His Purported Testing of A51.**

> **A. Dr. Chen failed to present clear and convincing evidence that he ever tested A51.**

Dr. Chen makes much of his purported testing of A51, arguing that merely

by testing A51, he contributed to the conception of the left-side pyridine structure

of the A-series compounds, which is one important feature of those novel

compounds. *See* AOB at 49. Dr. Chen premises his argument on three points,

alleging that he "(i) test[ed] A51 for the first time, (ii) report[ed] the good activity

it had to a member of the UCLA inventorship team, and (iii) show[ed] for the first

time that the pyridine substitution strategy could work for the RD project." *Id.*

The District Court, however, rejected all three points of Dr. Chen's story,

finding that he failed to establish that he (i) tested A51, (ii) communicated the

results of any testing to any of the named inventors, or (iii) showed for the first

time that the pyridine substitution could work, and Dr. Chen has not demonstrated

clear error in these findings. Appx0007-0008. Instead, the absence of

corroborated evidence fully supports the District Court's findings. Dr. Chen also

had to prove his contribution to the conception of the invention "with more than

[his] own testimony concerning the relevant facts" to meet his burden of clear and

convincing evidence.  *Linear Tech. Corp.*, 379 F.3d at 1327 (citation omitted).  But

Dr. Chen presented nothing more.

> **1.** **A bar chart with a compound labeled "CC1" that Dr. Chen did not share and Dr. Chen's uncorroborated testimony that "CC1" is A51 falls far short of meeting his burden of proof.**

The dearth of evidence that Dr. Chen introduced to show that he tested A51

and told anyone about the purportedly promising test results fully supports the

District Court's finding.  The evidence is as follows:

- A bar chart that Dr. Chen introduced into evidence (Appx0218-0220) with a bar labeled "CC1."  Appx1952-1955 [TX1003].  The exhibit does not refer to the A51 compound, whether by using, for example, the designation "A51" or by depicting the chemical structure of A51. Appx1952-1955, Appx2171 (Admitted Fact. No. 37).  The exhibit does not indicate anywhere the structure of the compound referred to as "CC1."  *See* Appx1952-1955.  Nor does it tie "CC1" to any compound, whether A51 or any other.  *Id.*

- Dr. Chen's admission that he did not show the test results for the compound labeled "CC1" to any other person at UCLA.  Appx2171 (Admitted Fact 38).

- Dr. Chen's own uncorroborated testimony that "CC1" in the bar chart

is A51.[3]  Appx0219.  Dr. Ouk testified that he did not know what

"CC1" was.  Appx0411-0412.

On this record, the District Court's finding that Dr. Chen "has not established that he tested A51" is amply supported by the paucity of corroborated evidence supporting the contrary conclusion.  Appx0008.

In spite of this lack of proof, Dr. Chen continues to premise his inventorship claim on his testing of the compound called "CC1."  Yet Dr. Chen has not identified any error in the District Court's finding that he "offered no evidence— aside from his own testimony—establishing that CC1 is the same compound as that which would later be called A51."  Appx0007.  The District Court relied on Dr. Chen's admission that "he has no notes that suggest that CC1 is the compound with the left-hand pyridine ring, later called A51."  *Id.*; *see also* Appx2171 (Admitted Fact 30), Appx0259-0260.  The record lacks any evidence other than Dr. Chen's word connecting "CC1" to A51.  The District Court's factual findings should not be disturbed.

Similarly, the record also fails to support Dr. Chen's allegation that he conveyed the results of testing the compound called "CC1" to anyone.  Instead, the record supports the District Court's finding that Dr. Chen did not provide anyone,

---

[3] While Dr. Chen testified that "CC" was short for "created compound" (Appx0259), that nomenclature could be a stand-in acronym for any compound.

including Dr. Ouk, with the alleged test results for "CC1." *See* Appx0003. None of Dr. Chen's colleagues corroborated his story. The only person that Dr. Chen claims he spoke to, Dr. Ouk, denied that Dr. Chen told him the real test results for A51. Appx0410-0412. And despite claiming that the "CC1" test results showed biological activity, Dr. Chen admitted that he did not show the test results for a compound labeled "CC1" to any other person at UCLA. Appx2171 (Admitted Fact 38). Dr. Chen also testified that he did not share the results of testing "CC1" in any lab meeting. Appx0266-0267.

On this record, Dr. Chen failed to prove that he tested A51 by clear and convincing evidence, and therefore cannot show clear error by the District Court. But, even if the Court were to favorably view Dr. Chen's uncorroborated story that his testing of "CC1" was actually testing of A51, that would not be enough to conclude that Dr. Chen is a joint inventor of the A-series Patents. In *Vanderbilt University v. ICOS Corp.*, 601 F.3d 1297, 1305-06 (Fed. Cir. 2010), this Court concluded that a putative inventor's story, which was "equally plausible" as the named inventor's version, fell short of the "clear and convincing" evidence necessary for inventorship. Here, Dr. Chen's story is not supported by anything other than his own uncorroborated testimony. That is insufficient as a matter of law to establish inventorship. *Singh*, 317 F.3d at 1340-41 ("It is well established that when a party seeks to prove conception via the oral testimony of a putative

inventor, the party must proffer evidence corroborating that testimony." (citation omitted)).

Moreover, Dr. Chen's failure to communicate the test results to anyone else at UCLA precludes him from being a *joint* inventor. To be a joint inventor, Dr. Chen must have had "some open line of communication during or in temporal proximity" with his co-inventors about their inventive efforts. *Aradigm Corp.*, 376 F.3d at 1359-64. Dr. Chen admitted that he did not show the "CC1" bar chart to anyone at UCLA (Appx2171 (Admitted Fact 38)), so the District Court did not err in holding the testing alone is insufficient to establish joint inventorship.

### 2. The District Court's finding was not clearly erroneous under the rule of reason analysis.

Dr. Chen's complaint that the District Court ignored the totality of the evidence regarding his alleged testing of A51 under the rule of reason also fails. The additional peripheral details relied upon by Dr. Chen do not demonstrate clear error given the absence of evidence contradicting the District Court's finding that Dr. Chen did not establish that he tested A51 or shared a positive test result for "CC1." Even after consideration of Dr. Chen's attempt to cobble together insignificant facts under the guise of a rule of reason analysis, his arguments should be rejected.

### a. The District Court's credibility determinations against Dr. Chen with respect to the events surrounding the testing of A51 are entitled to strong deference.

Notably, specifically with respect to Dr. Chen's claims that he tested A51, the District Court's findings of fact credit Dr. Ouk's testimony that Dr. Chen did not give Dr. Ouk the test results, over Dr. Chen's testimony that Dr. Chen told Dr. Ouk the positive results. *See* Appx0003. The District Court summarized the facts as follows:

> Plaintiff did not tell Dr. Ouk about the test results, to the extent any such tests were done. Instead, Plaintiff told Dr. Ouk to destroy his lab notebook and conceal the evidence that A51 was ever made at UCLA. Approximately one week later, Plaintiff told Dr. Ouk that the compound was not active. Plaintiff never provided Dr. Ouk with any documents showing the test results of A51.

Appx0003.

Dr. Chen has identified no basis for this Court to question the District Court's credibility determination. Dr. Chen argues that he has an email that is a "smoking gun" that proves that Dr. Chen told Dr. Ouk about his A51 test results. *See* AOB at 55. But far from being a "smoking gun," it is an ambiguous email written by Dr. Ouk that references an unidentified chemical scaffold. *See* Appx1886 [TX169]. In it, Dr. Ouk says, "An original (patentable) scaffold was tested. The design of this molecule was inspired by RD series but we propose [a]

new chemical identity (thus widely patentable). Only one compound representing this scaffold was made. Its activity is encouraging." *Id.*

Dr. Ouk testified that the scaffold referenced in the email was not A51, but instead was directed to a *third* series of compounds, this one containing a pyrazolone ring (*i.e.*, a ring containing two nitrogen atoms), then called RD144. Appx0355. According to Dr. Ouk, by the date of the email, he had synthesized only this one compound, RD144, from the pyrazolone series, and he had received the test results for RD144 from Dr. Chen. Appx0355-0356. To counter this testimony, Dr. Chen argued that RD144 could not have been tested on the date of this email because the test results were not so recorded in his lab notebooks. Appx0231. But Dr. Chen's own admissions undermine this assertion and support the District Court's decision not to give it the weight that Dr. Chen urges. Specifically, Dr. Chen admitted that his lab notebooks were an incomplete record of tests he conducted at UCLA—after all, they do not even contain any test results of A51, on which he now hinges his claim to inventorship. Appx0259-0260, Appx0265.

Moreover, as the District Court found, even if the scaffold in Dr. Ouk's email was referencing A51, nothing in the email supports the conclusion that it was *Dr. Chen* who tested it. Appx0007. Dr. Chen's argument that there was no evidence that it could have been anyone other than him misses the point. *See* AOB

at 57-59.  Dr. Chen had the burden to show by clear and convincing evidence that *he* was the person who tested A51.  The ambiguous email fails to provide any affirmative evidence of this purported fact, let alone evidence that meets the clear and convincing standard.

Dr. Chen identifies no clear error by the District Court, and no basis on which to overturn the District Court's credibility determinations that credited Dr. Ouk over Dr. Chen with respect to Dr. Chen' s contention that he tested A51 and communicated those alleged test results to Dr. Ouk.

> **b.    Dr. Chen's other purportedly "circumstantial" evidence adds nothing to the inventorship analysis.**

The smattering of other purported evidence that Dr. Chen relies on to support his alleged testing of A51 changes nothing.  As circumstantial evidence of his testing of A51, Dr. Chen relies on (a) a statement by Dr. Sawyers at trial identifying "CC1" as A51; (b) Dr. Ouk's letter to Dr. Sawyers in which Dr. Ouk says that Dr. Chen tested A51 but did not reveal the results to Dr. Ouk; and (c) drawings of additional compounds in Dr. Ouk's lab notebooks dated February 18, 2005.  AOB at 50-52.  Whether viewed alone or in combination, none of this circumstantial evidence rises to the level of clear and convincing evidence of inventorship.

First, Dr. Sawyers' statement at trial that "CC1 is what we now know is A51" was merely a summary of what Dr. Chen said earlier in the bench trial, not

contemporaneous corroboration that supports Dr. Chen's inventorship story. *See* AOB at 50 (citing Appx0316). In his testimony, Dr. Sawyers was recounting what Dr. Ouk had told him—namely that Dr. Chen

> after testing what we now know to be A51 but what was called CC1, had reached out to [Dr. Ouk] to hide the data, to destroy the lab notebooks that had been tested, and to join him in a startup company and remove evidence that this testing had been done at UCLA.

Appx0316. There is no dispute that Dr. Chen did not tell Dr. Sawyers about either "CC1" or A51 in 2005, so Dr. Sawyers could not have been providing the contemporaneous corroboration that Dr. Chen needs. *See* Appx0267 (Dr. Chen admitting that he did not tell Dr. Sawyers about A51); Appx0321 (Dr. Sawyers testifying that he does not recall discussing A51 with Dr. Chen).

Second, Dr. Ouk's letter memorializing the events surrounding A51 similarly fails to provide corroboration of Dr. Chen's alleged inventive contribution. Appx1872. In it, Dr. Ouk says, "[t]he biological data of A51 had been tested by Charlie [Dr. Chen] but Charlie [Dr. Chen] did not reveal its activity to me as usual." Appx1872. Dr. Ouk testified at trial that while he handed A51 to Dr. Chen for testing, Dr. Ouk never knew for sure whether Dr. Chen actually tested A51. Appx0410-0413. At the time Dr. Chen told Dr. Ouk that A51 was not active, it stands to reason that Dr. Ouk believed Dr. Chen had tested A51 because Dr. Chen told him the disappointing results. Appx0410-0413. Nothing in the

letter, however, provides the contemporaneous corroboration of Dr. Chen's testing of A51 and communication of those test results to Dr. Ouk that Dr. Chen needs to corroborate his story. At best, the letter reflects Dr. Ouk's suspicion that Dr. Chen could have tested A51 and hidden the results.

Moreover, even if Dr. Chen's testing of "CC1" constitutes testing of A51, this letter underscores why Dr. Chen is *not* a joint inventor. Joint inventorship requires communication between joint inventors of some form:

> [An] alleged joint inventor . . . must demonstrate that his labors were conjoined with the efforts of the named inventors. Joint inventorship under section 116 can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts.

*Aradigm Corp.*, 376 F.3d at 1359. This letter and Dr. Ouk's testimony show that Dr. Chen never shared the test results, and thus Dr. Chen cannot be a joint inventor on the basis of testing the "CC1" compound.

Third, Dr. Chen speculates that certain drawings in Dr. Ouk's lab notebooks are connected to the testing of A51. In the lab notebooks, the pages dated February 18, 2005, reflect Dr. Ouk's drawings of ideas for alternative chemical structures. Appx1963 [TX1019]. The compound reflecting the structure of A51 is labeled "parent compound." *Id*. Many of the structures drawn on the page underneath it have a different left-hand ring. *See id.* Dr. Ouk testified that "this page depict [*sic*]

my idea of the heterocyclic compound that might be also used in the first aryl ring." Appx0331. With nothing more than this, Dr. Chen speculates that these drawings must be connected to his conveyance of successful test results of A51 to Dr. Ouk. *See* AOB at 51-52. But, these drawings by a chemist of additional ideas for chemical compounds—that have an entirely different left-hand ring than the RD-series Compounds or the A-series Compounds—cannot possibly tell that tale. It is equally plausible, if not more likely, that Dr. Ouk started drawing more compounds with variations to the left-hand ring because he was told by Dr. Chen that A51 was *not* active. Thus, this page of drawings does not corroborate Dr. Chen's story that he tested A51 and communicated those results to Dr. Ouk.

On this record, the District Court did not commit clear error in its findings of fact. As such, Dr. Chen failed to prove by clear and convincing evidence that he tested A51 or communicated any results of his purported testing.

### B. Even if the District Court erred in finding that Dr. Chen did not prove that he tested A51, he still failed to establish inventorship because the conception of A51 had already occurred.

The District Court also correctly held that "even if Plaintiff could corroborate that he tested A51, this alone would be insufficient to establish inventorship. *Intercept Pharms., Inc. v. Fiorucci*, 277 F. Supp. 3d 678, 683 (D. Del. 2017) (citing *Burroughs Wellcome*, 40 F.3d at 1229-30) (holding that confirmatory testing does not constitute a contribution to conception)." Appx0007.

As a preliminary matter, Dr. Chen never identified the claim or claims of the A-series Patents on which he rests his inventorship challenge. Appx0005 ("At trial, Plaintiff did not identify any patent claim to which he contributed."). To the extent Dr. Chen attempts to rely upon claims relating to the chemical structure of A51, conception was complete prior to his alleged testing. The conception of a chemical compound "includes knowledge of both the specific chemical structure of the compound and an operative method of making it." *See Burroughs Wellcome*, 40 F.3d at 1229. Conception of the chemical structure of the compound requires "'a firm and definite idea' of the claimed combination of as a whole." *Bd. of Educ. ex. rel. Bd. of Trustees of Fla. State Univ. v. Am. Biosci., Inc.*, 333 F.3d 1330, 1341-42 (Fed. Cir. 2003). When inventors have in mind both the structure and an operative method of making a chemical compound, conception is complete. *See Burroughs Wellcome*, 40 F.3d at 1229. Here, those inventive aspects necessarily would have been complete before Dr. Chen's alleged testing of the compound.[4]

---

[4] At trial, Dr. Chen alleged only an inventive contribution to the A51 compound. Dr. Chen also admitted that the testing confirmed what the chemists believed, and that he shared that belief prior to testing it.

Q Again let me remind you what you said in your deposition, please. Page 224, lines 6 through 18:

"Question: And you're saying that when you ran assays that it was confirmatory, you confirmed what the chemist believed about A51?

(Continued…)

Moreover, the testing here was not part of conception but rather reduction to practice because by the time of the testing, the chemists, Dr. Ouk and Dr. Jung, had a specific and reasonable scientific rationale and belief as to why the addition of the nitrogen to the left-hand ring would work. Appx0652-0653 [TX28], Appx0429-0430, Appx0652, Appx1872-1873 [TX138], Appx0400-0402. "[A]n inventor need not know that his invention *will* work for conception to be complete . . . . He need only show that he had the idea; the discovery that an invention actually works is part of its reduction to practice." *Burroughs Wellcome*, 40 F.3d at 1228 (emphasis added). Dr. Ouk's and Dr. Jung's rationale and belief are sufficient for conception—conception does not require "proof to a scientific certainty that the construct is exactly what a scientist believes it is," but rather in such contexts inventors must have "formed a definite and permanent idea of the . . . inventive qualities." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*

---

Answer: It's not just chemist believe. It's I also believe. Okay. You can predict. I can predict. Chemist can predict. So when you want to do something, basically we say, hmm, this is probably going to work. Otherwise you won't make it, right? You have to have certain beliefs that you predict. Then when you say something, you say predict. I predict this is going to work. But that's not the phrase he used."

That was your testimony, correct?

A: Correct.

Appx0268-0269.

*v. Hedrick*, 573 F.3d 1290, 1299 (Fed. Cir. 2009) ("[I]t is immaterial that [the inventors'] knowledge was not scientifically certain."). Thus, a test that merely confirmed Dr. Ouk and Dr. Jung's existing rationale and belief "does not constitute a contribution to conception, but is considered reduction to practice." *Intercept Pharms., Inc.*. 277 F. Supp. 3d at 683.

Accordingly, with conception already completed, the mere testing of A51—if it was done at all—would not have made Dr. Chen an inventor, and the judgment should be affirmed.

## III. The District Court Did Not Clearly Err in Holding that Dr. Chen's Claims of Developing A Testing System that Was Allegedly Used to Test A51 Was Insufficient to Prove Inventorship of the A-Series Compounds.

The District Court also did not err when it rejected Dr. Chen's arguments that premise his alleged inventive contribution to the A-series Patents on the purportedly novel testing system that he developed for the RD-series project. There is no dispute that the testing system that Dr. Chen described is disclosed in separate RD-series Patents, or Dr. Sawyers' expert testimony that the testing system was publicly known by 2005 was unrebutted. Appx0250-0251, Appx0456-0461.

**A.** **The District Court did not clearly err in finding that Dr. Chen did not establish that he developed and designed innovative systems and methods to test the A-series Compounds.**

The District Court did not clearly err in finding that Dr. Chen's contributions to the novel testing method used for the RD-series Compounds had no specific ties to the patent claims for the A-series Patents. *See* Appx0007. Dr. Chen failed to identify the patent claims he relies on to support his inventorship claim, and provided no evidence that the testing system that he used had any relationship to the claims of the A-series Patents. Moreover, there is no dispute that the testing system is included in separate RD-series Patents,[5] and Dr. Sawyers' expert testimony that the testing system was publicly known at the time Dr. Chen allegedly used it to test A51 was unrebutted by Dr. Chen. Appx0250-0251, Appx0456-0461; *see also* Appx0007 (finding that "Plaintiff admitted at trial that the patents which cover the RD-series compounds also cover the luciferase reporter system," and that "Dr. Sawyers offered expert testimony that the PSA ELISA study cited by Plaintiff was publicly known by 2005"). The District Court did not err in its findings.

Dr. Chen's argument that his invention need not be "specific" to count toward joint inventorship under *Falana v. Kent State University*, 669 F.3d 1349

---

[5] These patents are not in the record. This fact is supported by Dr. Chen's testimony. Appx0250-0251.

(Fed. Cir. 2012), rests on an incorrect reading of that case. *See* AOB at 42-43.

The question before the *Falana* panel was "whether a putative inventor who envisioned the structure of a novel chemical compound and contributed to the *method of making that compound is a joint inventor of a claim covering that compound.*" *Id.* at 1357 (emphasis added). The omitted inventor had developed a synthesis protocol for making this genus of compounds. *Id.* at 1352. Because the patent at issue in *Falana* included claims reciting a subset of this genus of chemical compounds for which this synthesis protocol was used, the court concluded that the omitted inventor "contributed to the conception of this genus by providing the team of which he was a part with the method for making these novel compounds." *Id.* at 1359.

Here, however, Dr. Chen's testing system is not a method of making any compounds claimed in the A-series Patents. Dr. Chen's development and use of the testing system had no bearing on the invention of the compounds claimed in the A-series Patents, regardless of the amount of time and effort he put into their development. Indeed, the *Falana* panel's decision "is simply the application of the well-known principle that conception of a compound requires knowledge of both the chemical structure of the compound and an operative method of making it." 669 F.3d at 1358. Accordingly, Dr. Chen's heavy reliance on *Falana* is of no avail.

Finally, Dr. Chen's attempt to confuse the issues by asserting that the "RD project" includes both the RD-series Compounds and A-series Compounds is unsupported. Dr. Chen has identified no contrary evidence suggesting that the District Court erred in finding that the two series of compounds are separate and distinct. *See* Appx0008. The development paths of the two series were different, and the results were separately patented. Further, Dr. Winkler's expert testimony regarding the distinct differences between the two series was unrebutted. Indeed, Dr. Chen admitted that the "RD compound patents [are] independent from" the patents at issue in this case. Appx0250. Whether the name of the project did or did not encompass, or should or should not have encompassed, one or more scaffolds is immaterial. What is material is that Dr. Chen lacks evidence to show that he made any contributions to the conception of the compounds that are the subject of the *A-series Patents*.

> **B.** **The District Court did not clearly err in finding that Dr. Chen's alleged development of a novel testing system was not an inventive contribution to the A-series Compounds because it was publicly known when the compounds were conceived.**

Even assuming that the development of a testing system could confer inventorship—and here it cannot—and even assuming that Dr. Chen could show clear error such that his testing of "CC1" constituted testing of A51—and here he cannot—the District Court did not err when it found that the testing system in question was publicly known by the time Dr. Chen tested the "CC1" compound,

and thus, he could not have developed it to test the A-series Compounds. In other words, the District Court found from the evidence at trial that the testing system Dr. Chen cited as his contribution to the A-series Patents was actually publicly known as of February 2005—thus, the use of that system to confirm the activity of novel compounds already conceived by someone else was not a patentable invention.

Dr. Sawyers, who was qualified as an expert in the field of cancer research tools and methodologies, cancer treatments, oncology and biology (Appx0450), testified that the testing methods that would have been used to obtain the results in Dr. Chen's "CC1" bar chart would have been "publicly available and practicable by a biologist trained in cell culture and molecular biology" and involved "standard techniques" by February 2005, when Dr. Chen purportedly tested A51. Appx0451-0461. The relevant information was made available in a *Nature Medicine* article published online, over a year prior, on December 21, 2003, of which Dr. Sawyers was the senior author.[6] Appx0248-0249, Appx0456-0461, Appx0533-0539 [TX9]. Moreover, Dr. Chen admitted that: (1) the cell lines he used to generate the "CC1" data were described in that *Nature Medicine* article; (2) the luciferase reporter he used in the "CC1" testing was "off the shelf;" (3) to

---

[6] Dr. Chen continues to insist upon calling himself the "first author" of this article. *See* AOB at 9. He and Derek Welsbie are "co-first" authors as indicated in footnote 8 of the article. Appx0533.

measure PSA levels in the cell lines, as he did, "you just buy the kit;" and (4) these in-vitro tests were just a "regular test."  Appx0262-0264.

In sum, and consistent with Dr. Sawyers' unrebutted expert opinion[7] and Dr. Chen's own admissions, by February 2005, when Dr. Chen tested "CC1," the testing system was publicly known and not inventive.  Thus, as a matter of law, that testing cannot be the basis of his inventive contribution.  *See Pannu*, 155 F.3d at 1351 (stating that to qualify as a joint inventor, one must "do more than merely explain to the real inventors well-known concepts and/or the current state of the art" (citations omitted)).

Accordingly, the District Court did not err in finding that Dr. Chen did not establish that he developed and designed innovative systems and methods to test the A-series Compounds.

## IV. The District Court Did Not Clearly Err in Concluding that Dr. Chen's Alleged Identification of RD37 and RD162 as Lead Compounds Was Insufficient for Inventorship of the A-Series Compounds.

The District Court's finding that "Plaintiff . . . offered no independent, contemporaneous corroborating evidence that he identified RD37 and RD162 as bases for the A-series compounds" was not clearly erroneous.  Appx0006.

Nothing in the factual record supports a contrary conclusion.

---

[7] Dr. Chen did not present expert testimony to rebut Dr. Sawyers' expert testimony.  Dr. Chen did not proffer his expert as qualified with respect to biology, biochemistry, or biological assays, as Dr. Sawyers was.  Appx0363-0364.

**A.     Dr. Chen failed to establish that he identified any RD-series Compounds as the bases for A-series Compounds or that he came up with the particular combination of elements in the A-series Compounds.**

Dr. Chen has shown no clear error in the District Court's finding that he "offered insufficient evidence that he contributed to the conception of the A-series Patents by identifying RD37 and RD162 as the lead compounds for A51 and A52." Appx0006.  Dr. Chen does not challenge the District Court's finding that he failed to establish that he proposed the pyridine ring substitution for RD37 or RD162 (*see* Appx0006), leaving simply his general work on the RD-series Compounds as the basis for his argument.

The District Court's findings of fact are supported by the complete lack of evidence, other than Dr. Chen's own uncorroborated testimony, that Dr. Chen identified those RD compounds as the bases for the A-series Compounds or otherwise came up with the particular combination of elements constituting the A-series Compounds.  The conception of the A-series Compounds involved the innovative decisions to combine a left-hand pyridine ring with a central spirocyclic thiohydantoin and a right-hand aryl ring (Appx0480-0481, Appx0398-0399, Appx0426-0428), which the District Court properly attributed to Drs. Jung and Ouk.  Appx0002-0003.  These chemists testified that they came up with this particular combination of elements, not Dr. Chen.  Appx0397-0402, Appx0417, Appx0426-0429, Appx0445-0446, Appx0322-0325, Appx0352-0354.  In making

this finding, the District Court also implicitly rejected the testimony of Dr. Chen's expert on the topic of Dr. Chen's alleged contributions, and the District Court's weighing of expert credibility is entitled to wide discretion. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 929 (Fed. Cir. 2012).

Dr. Jung and Dr. Ouk also both testified that Dr. Chen did not contribute anything to the rationale for this particular combination of elements with the pyridine ring. Appx0400-0402, Appx0431. Indeed, the unrebutted expert testimony of Dr. Winkler at trial established that Dr. Chen did not understand the chemistry principles necessary to know or suggest that one could combine the left-hand pyridine ring with other elements common to RD37 and RD162, or the rationale for why one would do so. Appx0269-0271, Appx0476, Appx0489-0491.[8] Both Dr. Chen and his expert witness conceded that Dr. Chen had no notes or documents showing that alleged combination. Appx0245-0247, Appx0257-0258, Appx0265, Appx0382. In addition, combining the "idea of A51 and RD162" to

---

[8] Dr. Winkler's unrebutted expert testimony established that without an understanding of these principles, it would not be possible to invent the A51 and A52 compounds. Appx0476, Appx0489-0491. This is because the pyridine ring in the context of the overall combination of elements in the A-series compounds imparts dramatic overall changes to the molecules, as compared with the RD-series molecules, which have a benzene ring. Appx0482-0489. Accordingly, developing the structure of the A-series Compounds "went way beyond the structure, the body of structure activity relationship data that was available from the RD-series." Appx0489.

create A52 was not done by Dr. Chen, but by Dr. Ouk, as evidenced by a contemporaneous letter to Dr. Sawyers recording this idea. Appx1872.

Thus, Dr. Chen failed to show any contribution to the claimed inventions, and the evidence at trial established that there was no "collaboration and joint behavior" or "joint arrival" at a definite and permanent idea of an invention that involved Dr. Chen and A51 or A52. *See Vanderbilt*, 601 F.3d at 1303. While each joint inventor "need not have their own contemporaneous picture of the final claimed invention," and co-inventors need not work together in the same physical location or same time, "each inventor must contribute to the *joint arrival* at a definite and permanent idea of the invention as it will be used in practice." *Id.* (emphasis added).

All Dr. Chen has shown is that he worked on the RD-series Compounds, which at most served as part of the inspiration for the A-series Compounds. This is not the test for the conception of a chemical compound. "[T]eaching skills or general methods that somehow facilitate a later invention, without more, does not render one a coinventor." *Am. Biosci.*, 333 F.3d at 1342. Here, where Dr. Chen is claiming to have contributed to the invention of the A51 and A52 Compounds, he must have contributed to the *joint* invention of the structure of the claimed compounds or the operative method of making those compounds. *See id.*

Having no credible connections to the A-series Compounds, Dr. Chen's mere alleged involvement in an earlier identification of RD-series Compounds that have some elements in common with the A-series Compounds is insufficient to render him an inventor of the *A-series Compounds*. Dr. Chen's assertions are similar to the arguments rejected in *American Bioscience*, 333 F.3d 1330. There, an alleged coinventor was found not to be a true inventor where the chemical compound at issue contained "the exact same side chain" (*i.e.*, a part of a molecule) as an earlier compound that had been invented by the alleged coinventor, because there was no evidence that the alleged coinventor had contributed to the conception of the "combination" of that side chain with other functional groups to make up the claimed compound. *Id.* at 1341-42. The alleged coinventor was found not to be an inventor because there was no evidence that he had contributed to "'a firm and definite idea' of the claimed combination as a whole." *Id.*

Even if Dr. Chen's unsupported assertions are credited, an inventorship claim should be rejected where evidence shows only that an alleged inventor generally discussed a particular molecule and suggested it as a candidate for further pursuit, without clear and convincing evidence of the alleged inventor's communication of a firm grasp of the claimed invention. *See Aradigm Corp.*, 376 F.3d at 1363-64. Here too, Dr. Chen presented no clear and convincing evidence

that he ever discussed the use of RD162 or RD37 in connection with A51 or A52.

Dr. Chen's attenuated assertions fail to demonstrate *any* contribution to the specific invention of the A-series Compounds. Accordingly, the District Court properly concluded that Dr. Chen failed to prove by clear and convincing evidence that he should be a joint inventor.

> **B.      Dr. Chen presented no evidence of any particular contribution he made to the chemical design of the right-hand side of RD37 or RD162.**

To the extent Dr. Chen is now attempting to base his inventorship challenge on his alleged contribution to the chemical structure on the right-hand side of the RD37 or RD162 compounds, this argument has been waived. *See Rentrop v. Spectranetics Corp.*, 550 F.3d 1112, 1116-17 (Fed. Cir. 2008) (declining to consider appellant's argument raised on appeal for the first time). Apparently realizing the issue with his sweeping generalizations, Dr. Chen argues for the first time on appeal that he contributed to the right-hand structure of RD162. AOB at 69 ("Dr. Chen supplied this 'RD162' structure…"). Dr. Chen never testified about this at trial. Instead Dr. Chen's challenge to inventorship was limited to the theories that he: (1) "identified the lead chemical compounds believed to have biological effects in humans;" (2) "designed the chemical changes to those specific lead compounds;" and (3) "meaningfully and efficiently tested new compounds to see if they could work biologically better." Appx0503 (closing arguments);

Appx2174-2180 (Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law, Dkt. 242-1). He did not argue that he contributed to the chemical structure of the right-hand side of RD37 and RD162, and therefore cannot properly raise this issue for the first time on appeal. *See Rentrop*, 550 F.3d at 1116-17.

Nonetheless, Defendants address this argument for completeness. The District Court made no legal error in concluding that Dr. Chen is not a joint inventor where he did not present any evidence at trial regarding his specific contributions to the chemical structures on the right-hand side of RD37 and RD162, and further presented no credible evidence that he ever communicated any of his alleged thoughts regarding the application of the right-hand side of RD37 and RD162 to the design of A51 and A52. *See Aradigm Corp.*, 376 F.3d at 1359-64 (joint inventorship requires collaboration and open line of communication). Dr. Chen conflates his role in the iterative SAR analysis and work on the RD-series Compounds as the same as "supplying" the right-hand side of RD 37 or RD162 structure for use in the A51 or A52 Compounds. *See* AOB at 69. But, at trial, Dr. Chen presented no evidence of what he contributed to the design of the chemical structure of the right-hand side of RD37 or RD162, and the District Court did not find that Dr. Chen designed the relevant compounds. Without more, the record does not support the leap that Dr. Chen is asking this Court to make—essentially to infer inventorship generally from one set of patents to another.

**V.      The District Court Did Not Clearly Err in Holding that Dr. Chen Cannot Be an Inventor of the A-Series Compounds Simply Because of His General Work on the RD-Series.**

Dr. Chen's assertions about the impact his work on the RD-series Compounds had on the A-series Compounds do not confer inventorship, for all of the reasons set forth above.  Despite making sweeping claims about the significance of his contributions to the RD-series Compounds, none are tethered to any particular claim of the three *A-series* Patents.  Even assuming that "but for" Dr. Chen's work on the RD-series Compounds, the A-series Compounds would not have been conceived by his colleagues, that is still insufficient to render Dr. Chen a joint inventor.  All inventions are built upon or inspired by other ideas.  "But for" causation is not the test for conception.

Notably, not one case cited by Dr. Chen finds inventorship without identification of the patent claim to which the putative inventor contributed.  For example, in *In re Verhoef*, 888 F.3d 1362 (Fed. Cir. 2018), the patent application "included a *single independent claim* that expressly recited a figure eight loop that engages the dog's toes[.]"  *Id.* at 1364 (emphasis added).  It was to this claim that the omitted inventor was found to have contributed: "[putative inventor] is a joint inventor because she contributed the idea of the figure eight loop, and the figure eight loop is an essential feature of the *claimed invention.*"  *Id.* at 1366 (emphasis added).

The District Court's conclusion that Dr. Chen's work on the RD-series Compounds does not automatically make him an inventor of the A-series Patents simply reflects a corollary to Dr. Chen's failure and inability to point to any patent claims: "In light of the absence of any evidence that Plaintiff significantly contributed to *the compounds at issue in this case*," the District Court found that Dr. Chen did not contribute to the invention. Appx0008.

Dr. Chen attempts to get around his lack of evidence and connection to the A-series Patents' claims by inflating his contributions to the prostate cancer project, despite the District Court findings of fact to the contrary. For example, Dr. Chen continues to assert that he personally started this drug discovery project in 2003, refusing to attribute any credit to the contributions of the other members of the lab or the two professors who started and led the project in their labs. *See* AOB at 10-12. At trial, he went so far as to claim that he was an independent faculty member who did not report to Dr. Sawyers (Appx0174), despite having his lab space in Dr. Sawyers' laboratory and never having been appointed to such an independent faculty position. Appx0444-0445. The District Court, however, credited the named inventors' testimony that Dr. Jung and Dr. Sawyers initiated the drug discovery project in 2002 (Appx0002), and further found that Dr. Chen worked in Dr. Sawyers' lab (Appx0002). Dr. Chen has identified no clear error in disturb these findings.

The evidence in the record below compels the conclusion that Dr. Chen failed to prove that he significantly contributed to the compounds at issue in this case. Dr. Chen's alleged connection to the A-series Compounds are his attendance at the August 31, 2004 meeting during which Dr. Jung and Dr. Ouk—not Dr. Chen—discussed changes to the chemical compounds with which they have been working; and his testing of "CC1," which he purports to be testing of A51, and for which he has no objective corroborating evidence. Dr. Chen admitted that he did not do any work specifically relating to A51 or A52, and specifically denied that he did anything with respect to the pharmaceutical composition, dosage, delivery mechanisms, or therapeutically effective amounts, of either A51 or A52. Appx0272-0274.[9]

The District Court's judgment should be affirmed.

## VI. On Appeal, Dr. Chen Has Waived His Contention that He Contributed to the Idea of the Pyridine Ring in A51.

At trial, Dr. Chen contended that he contributed to the invention of A51 by conceiving of the structure of A51 at either the August 31, 2004 meeting or a subsequent lunch with Dr. Ouk in October 2004. *See* Appx0005. As noted by the

---

[9] Though a biologist, Dr. Chen did not contend that he contributed to any of the biological aspects of the inventions claimed in the A-series Patents (*e.g.*, concentrations, dosages, delivery mechanisms etc.), and instead repeatedly admitted at trial that he did not contribute to the biology of the A-series Patent. Appx0272-0274.

District Court, all others present at both meetings denied this.  Appx0006, Appx0322-0325, Appx0352-0354, Appx0396-0402, Appx0426-0429, Appx0445-0446.  Dr. Chen presented no documents showing that he suggested these changes. Appx0005, Appx0252-0254 (Chen testimony admitting that he had no documents showing that Dr. Chen suggested the change of the pyridine ring on the left-hand side).  At trial, Dr. Chen ultimately admitted that he did not remember exactly what was discussed at the August 2004 meeting, and that he did not propose a pyridine structure at the meeting.  Appx0251-0252.

Now, on appeal, Dr. Chen has apparently abandoned this theory, as he did not raise it in his opening brief.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."  (citations omitted)).  In any event, the District Court did not clearly err in finding that Dr. Chen failed to meet his burden of proof to establish that he had come up with the idea of using the pyridine ring. With no documentary evidence or corroboration by Dr. Ouk, Dr. Chen had only his own testimony to support his claim, which the District Court correctly found insufficient to meet the clear and convincing burden of proof.

## CONCLUSION

Because the District Court did not clearly err in any of its factual findings, nor err in reaching its ultimate holding that Dr. Chen is not a joint inventor on the basis of these findings, Defendants-Appellees Michael E. Jung and Charles L. Sawyers respectfully request affirmance of the District Court's judgment.

Dated:  March 25, 2020          CROWELL & MORING LLP

*/s/ Mark M. Supko*
Mark M. Supko
Gabriel M. Ramsey
Emily T. Kuwahara
Chiemi Suzuki
Attorneys for Appellees
Michael E. Jung, Charles L. Sawyers

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  March 25, 2020                  CROWELL & MORING LLP


                                      */s/ Mark M. Supko*
                                      Mark M. Supko
                                      Gabriel M. Ramsey
                                      Emily T. Kuwahara
                                      Chiemi Suzuki
                                      Attorneys for Appellees
                                      Michael E. Jung, Charles L. Sawyers

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a) or Federal Rule of Federal Circuit Rule 28.1.

☒  This brief contains  *[state the number of ]*  ____13,455____  words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

☐  This brief uses a monospaced typeface and contains  *[state the number of ]*  _____

lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒  This brief has been prepared in a proportionally spaced typeface using

*[state name and version of word processing program ]*  Microsoft Word 2016  _____ in

*[state font size and name of type style ]*  14-point Times New Roman  _____ , or

☐  This brief has been prepared in a monospaced typeface using

*[state name and version of word processing program ]*  _____ with

*[state number of characters per inch and name of type style]*  _____ .

/s/ Mark M. Supko
_____
(Signature of Attorney)

Mark M. Supko
_____
(Name of Attorney)

Appellees
_____
(State whether representing appellant, appellee, etc.)

March 25, 2020
_____
(Date)