In The

# United States Court of Appeals
### For The Federal Circuit

# DEGUI CHEN,

*Plaintiff – Appellant*,

## v.

# MICHAEL E. JUNG, CHARLES L. SAWYERS,

*Defendants – Appellees.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
IN NO. 2:18-cv-02015-RGK-KS, JUDGE R. GARY KLAUSNER.**

————————————

## REPLY BRIEF OF APPELLANT

————————————

**Yixin H. Tang**
**Shashank Upadhye**
**Brent Allen Batzer**
**UPADHYE CWIK LLP**
**135 South LaSalle Street, Suite 1930**
**Chicago, Illinois  60603**
**(312) 598-2610**
**yixin@ ipfdalaw.com**
**shashank@ipfdalaw.com**
**brent@ipfdalaw.com**

*Counsel for Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Degui Chen

v. Michael E. Jung; Charles L. Sawyers

Case No. 2020-1255

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Degui Chen

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Degui Chen (an individual) | None | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

Mark B Brueggemann of Clinton and Clinton LLP (Long Beach, CA)
Gregory A. Ellis of Scheper Kim and Harris LLP (Los Angeles, CA)
Shashank Upadhye, Joseph Cwik, Yixin Tang, Brent Batzer, Samuel Ruggio, & Jennifer Adams of Amin Talati Upadhye LLP (Chicago, IL)
Shashank Upadhye, Joseph Cwik, Yixin Tang, & Brent Batzer of Upadhye Cwik LLP (Chicago, IL)

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b).  (The parties should attach continuation pages as necessary).

Federal Circuit Court of Appeals Docket No.: 2020-1257
Degui Chen v. Michael E. Jung, Charles L. Sawyers, Samedy Ouk, Christopher Tran, John Wongvipat

| 12/30/2019 | /s/ Shashank Upadhye |
|:---:|:---:|
| Date | Signature of counsel |
| | Shashank Upadhye |
| Please Note: All questions must be answered | Printed name of counsel |

cc:  Gabriel M. Ramsey

**Reset Fields**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION .................................................................................. 1

ARGUMENT ......................................................................................... 2

I.    THE DISTRICT COURT CLEARLY ERRED IN REFUSING TO FIND THAT DR. CHEN TESTED A51 IN EARLY 2005 AND COMMUNICATED THE TEST RESULTS TO DR. OUK ........................................................ 4

    A.    Drs. Sawyers and Jung Point to Nothing in the Record to Dispute that the "Smoking Gun" Email Indeed Proves that Dr. Chen Tested A51 in Early 2005 ................................................................... 4

    B.    It Was Clear Error Not to Conduct a Proper "Rule of Reason" Analysis that Would Compel the Conclusion that Dr. Chen Tested A51 and Conveyed the Results to Dr. Ouk ................................. 7

II.    DR. CHEN'S TESTING OF A51 WAS NOT "MERELY CONFIRMATORY," BUT AN IMPORTANT SAR ANALYSIS STEP THAT PROVED THE CANCER FIGHTING PROPERTIES OF A51 AND LED TO THE INVENTION OF THE A-SERIES GENUS OF COMPOUNDS ................................................................... 12

III.    DR. CHEN'S LUCIFERASE REPORTER-BASED CELL SYSTEM AND THE TESTING PARAMETERS HE DEVELOPED WERE INNOVATIVE, INTEGRAL TO THE JOINT EFFORT THAT LED TO THE A-SERIES COMPOUNDS, AND NOT PUBLICLY AVAILABLE AT THE RELEVANT TIME ........................... 17

A. The Trial Record Is Clear That Dr. Chen's Testing System and Assay Parameters Were Innovative and Not Publicly Available until More Than One Year after A51 and A52 Were Invented ..... 17

B. It Was Clear Error to Discount the Role Dr. Chen's Innovative, Reliable, and Efficient Testing System and Methods Played in the Invention Process of the A-Series Compounds ............................ 22

IV. DR. CHEN'S TESTING AND SAR ANALYSIS WAS A SIGNIFICANT CONTRIBUTION TO THE INVENTION OF BOTH THE RD-SERIES AND THE A-SERIES COMPOUNDS ..................................................... 25

A. Appellees Admit Dr. Chen Was an Active Member of the Team That Invented Numerous Cancer Fighting Chemical Compounds Including RD37 and RD162 through Iterative SAR Analysis and Chemical Compound Design ................................. 25

B. Drs. Sawyers and Jung Agree with Dr. Chen that an A-Series Compound Is a Combination of Parts, Including a Left Hand Side Pyridine Structure and a Right Hand Side Aryl Structure ........................ 27

C. Drs. Sawyers and Jung Admitted at Trial that the Invention of the A-Series Compounds Involved the SAR Analysis Conducted by Dr. Chen ............................................................................ 29

D. It Is Clearly Erroneous to Equate the Conception of the A-Series Compounds to "the Innovative Decisions to Combine"—the Conception Also Included the Identification of Specific Parts to Combine, to Which Dr. Chen Made Significant Contributions ............................................................. 31

CONCLUSION .......................................................................... 35

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Eli Lilly & Co. v. Aradigm Corp.,*
  376 F.3d 1352 (Fed. Cir 2004).................................................27, 34

*Ethicon, Inc. v. U.S. Surgical Corp.,*
  135 F.3d 1456 (Fed. Cir. 1998)...................................................8, 28

*Falana v. Kent State Univ.,*
  669 F.3d 1349 (Fed. Cir. 2012)................................................23, 24

*Fina Oil and Chem. Co. v. Ewen,*
  123 F.3d 1466 (Fed. Cir. 1997)........................................................34

# INTRODUCTION

Dr. Chen made significant contributions to (1) the structures of A51 and A52, by developing a cell system and assay parameters to enable SAR analysis, participating in the SAR analysis leading to the design of RD37 and RD162, and providing the right hand side "business end" structures of A51 and A52, respectively; (2) the structures of the entire genus of claimed "A series" compounds, by testing A51, communicating the good results to Dr. Ouk, and proving that the pyridine substitution strategy worked in cancer fighting chemical compounds; and (3) all method of treatment and pharmaceutical composition claims in the patents-in-suit, by testing A51 and RD162 to prove that both have cancer fighting properties. Dr. Chen should have been added as a co-inventor on the "A-series" patents-in-suit, but for the clear errors in the decision below.

In the Answering Brief, Drs. Sawyers and Jung make several admissions. They remain silent on other key points. The Answering Brief severely distorts the trial record and trial opinion, and impermissibly fragments trial evidence in a "rule of reason" analysis.

# ARGUMENT

In his Opening Brief, Dr. Chen showed, clearly and convincingly, that he had tested A51 in February 2005 and conveyed the good results to Dr. Ouk. (Opening Br. at 49-59). In their Argument II.A, Drs. Sawyers and Jung make serious distortions and improper fragmentation of the trial record. Part I, below, addresses Appellees' Argument II.A.

Dr. Chen's testing of A51 was not "confirmatory," and the communication of the testing results was one of the bases for Dr. Ouk to suggest combining "the idea of A51 and RD162" to make A52. (*Id.* at 60-73). Part II, below, addresses Appellees' Argument II.B.

The years-long SAR analysis depended on a custom-built, reliable and efficient luciferase reporter-based cell system and testing parameters Dr. Chen designed and developed. The system was not publicly available. Drs. Sawyers and Jung again distort the trial record in making their Argument III. Part III, below, is part of Dr. Chen's reply to Argument III.

Drs. Sawyers and Jung admit that Dr. Chen was an active member of the collaborative team for the prostate cancer drug discovery

project, and an active participant in the structure-activity relationship (SAR) analysis, that led to the invention of numerous "RD" compounds up to RD162. (Part IV.A, below). They agree that the "A series" compounds are a combination of parts, with the selection of the right hand side parts informed by the SAR analysis. (Part IV.B, below). They further admit that the selection of the right hand side structure of A52 was directly based on the biological testing and the SAR analysis on RD162 conducted by Dr. Chen. (Part IV.C, below). Part IV below is Dr. Chen's reply to Arguments III.A, IV and V in the Answering Brief. Drs. Sawyers and Jung make these overlapping arguments and improperly try to draw a bright line between the collaborative invention process of RD37 and RD162, on the one hand, and the same collaborative invention process that led to A51 and A52, on the other hand.

## I. THE DISTRICT COURT CLEARLY ERRED IN REFUSING TO FIND THAT DR. CHEN TESTED A51 IN EARLY 2005 AND COMMUNICATED THE TEST RESULTS TO DR. OUK

### A. Drs. Sawyers and Jung Point to Nothing in the Record to Dispute that the "Smoking Gun" Email Indeed Proves that Dr. Chen Tested A51 in Early 2005

At trial, Dr. Chen and his expert witness Dr. Bihovsky went through all the contemporaneously generated electronically stored data and laboratory notebooks pages, by both Dr. Ouk and Dr. Chen, and proved that a June 22, 2005 email from Dr. Ouk to Dr. Hung discussed the A51 compound as having already been tested and showed "encouraging" biological activity. (*See* Opening Br. at 52-55). Contrary to Dr. Ouk's unsubstantiated testimony that the "new scaffold" compound he told Dr. Hung about might have been RD144, Dr. Chen's laboratory notebook pages affirmatively show that the only attempt at testing RD144 before June 22, 2005, was not successful and resulted in no data. (Opening Br. at 56-57). No data from RD144 existed before June 22, 2005.

This "smoking gun" email proves that Dr. Chen tested A51 in early 2005 and told Dr. Ouk about the good testing results. In their Answering Brief, Drs. Sawyers and Jung twice call this email

"ambiguous" but cannot point to anything in the trial record to show that the identity of the "new scaffold" compound in this email has any ambiguity. (Answering Br. at 36-38). The district court never found this email "ambiguous."

Drs. Sawyers and Jung first try to rely on the district court's "credibility determination" pertaining to its factfinding that Dr. Chen did not tell Dr. Ouk about the good testing results from A51. The part of the trial opinion they quoted, however, did not address this smoking gun email at all. (Answering Br. at 36).

Drs. Sawyers and Jung then point to Dr. Ouk's trial testimony, who testified that the "new scaffold" compound in the email was "RD144, from the pyrazolone series." (Answering Br. at 37). However, on this important point that had major implications on the credibility of two main witnesses, the district court clearly did not credit Dr. Ouk's "I remember it was RD144" testimony. (Appx0007 (finding that the email "arguably support [Dr. Chen's] position" that he tested A51 and reported the results)). On this precise factual issue, i.e., was Dr. Ouk really referring to RD144 in the email?, the district court disregarded Dr. Ouk's testimony that was solely based on his own memory. That

credibility determination and the disregard of Dr. Ouk's testimony should be assigned its proper weight on appeal.

The way the district court sidestepped the problem of having a contemporaneously generated written record that contradicted its conclusion that Dr. Chen concealed information from Dr. Ouk was to suggest that someone else could have tested A51 and told Dr. Ouk the results were encouraging. (Opening Br. at 56-57; Appx0007). This speculation of "someone else tested A51" in the trial opinion had zero evidentiary support. (*Id.*). In their Answering Brief, Drs. Sawyers and Jung cannot point to anything that could even suggest that someone else tested A51 before June 22, 2005. Instead, they throw up their hands and challenge Dr. Chen to prove the negative. (Answering Br. at 38).

Even though Dr. Chen does not have to prove the absence of this "someone else" to show that the district court made a clear error here, he has already done so, actually. In the Opening Brief, Dr. Chen cited to trial testimonies of both Defendants, as well as a document from Dr. Ouk, to show that Dr. Chen was the only person running the cell system testing for the drug discovery project. (Opening Br. at 58).

Furthermore, Dr. Ouk confirmed at trial that, after he gave the first sample of A51 to Dr. Chen, he never made another A51 sample for anyone to test until late 2005. (*Id.* at 59). Drs. Sawyers and Jung have now confirmed the absence of any A51 samples in early 2005 for anyone not named Dr. Chen to run any testing on. (Answering Br. at 11 ("As a result of Dr. Chen's [purported] reporting of bad results, no further work was done on the A-series project until October 2005")).

Now that all parties to the lawsuit have had a full opportunity to search the trial record, the evidence is clear and convincing and can only support one conclusion—that Dr. Chen had tested the A51 compound (by whatever name) in early 2005, he told Dr. Ouk about the "encouraging" results, and Dr. Ouk understood and remembered what Dr. Chen told him. The district court's discounting of the "smoking gun" email and its refusal to find for Dr. Chen on the issue of A51 testing were clearly erroneous.

**B.    It Was Clear Error Not to Conduct a Proper "Rule of Reason" Analysis that Would Compel the Conclusion that Dr. Chen Tested A51 and Conveyed the Results to Dr. Ouk**

In addition to the "smoking gun" email discussed above, Dr. Chen adduced a number of evidence to show that the totality of the evidence

proves he tested A51 and conveyed the good results to Dr. Ouk. (Opening Br. at 50-52). The law requires the evaluation of "*all* pertinent evidence." *Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1461 (Fed. Cir. 1998) (emphasis in the original). Drs. Sawyers and Jung, however, improperly isolate the "CC1" testing results (Appx1952-1955) in their version of the "rule of reason" analysis. (Answering Br. at 32-35). Their "rule of reason" analysis further separates out the "smoking gun" email from the rest of the evidence in the trial record. (*Id.* at 35-41). This is again improper under *Ethicon*. Therefore, Appellees' argument should be rejected.

It is important to note the connection among the evidence. (Opening Br. at 50-52). The "CC1" results were generated on February 11 and February 15, 2005, which fit the typical "2 to 3 weeks" synthesis-to-test-results interval in view of the January 2005 synthesis of A51. (*Id.* at 50-51). Drs. Sawyers and Jung ignore this timing connection. Then, on February 18, 2005, Dr. Ouk drew numerous chemical structures in his laboratory notebook under a structure drawing of A51 labelled as "parent compound." (*Id.* at 51-52). Dr. Bihovsky testified that these drawings indicated a chemist's interest in making analogues

of A51. (*Id.* (citing to Appx0375)). The interest Dr. Ouk showed in the A51 "parent compound" and potential analogues came days after Dr. Chen's testing of "CC1."

Drs. Sawyers and Jung argue that Dr. Ouk might be exploring alternatives to A51 because A51 was reportedly inactive, but they cite to nothing in the record. (Answering Br. at 41). Dr. Jung's trial testimony undermines this argument. Dr. Jung explained that,

> if a compound . . . was completely inactive, you just drop it because you didn't see any reason to continue. But if a compound looked good, you then have to come up with a chemical idea for . . . what different groups could we put on the molecule that might help get better activity.

(Appx0424 (describing SAR analysis and compound design process)). A "parent" produces descendants, analogs, but not alternatives. Dr. Ouk drew A51 as the "parent compound." He did not "just drop it" as Dr. Jung said he would have done if he knew A51 was inactive. These laboratory notebook entries are strong indication of Dr. Ouk's knowledge of A51's good biological activity in *February* 2005.

The "CC1" testing results and the "parent compound" drawing by Dr. Ouk take on more significance in view of the nameless "new scaffold" compound in Dr. Ouk's June 22, 2005 email to Medivation. In

the "smoking gun" email, Dr. Ouk named all types of compounds with their "RD" designations, but not the unique "new scaffold" compound he discussed. (Opening Br. at 55). The only testing data in the trial record without an "RD" designation before June 22, 2005, are the "CC1" data. (Appx0219 ("Only this one he didn't have a name")). The only compound synthesized for the drug discovery project that did not have a name as of June 22, 2005, was A51. (Appx0377 (Dr. Bihovsky: "all these compounds had RD numbers except CC1 for some reason")). When viewed together in a "rule of reason" analysis, the "CC1" compound, the "parent compound" of February 18, 2005, and the "new scaffold" compound of the smoking gun email, are clearly the same thing.

It is also important to evaluate the "smoking gun" email along with Dr. Ouk's October and November 2005 letters, because these letters shed light on who else could have tested A51 in early 2005. The court below did not credit Dr. Ouk's testimony that the "new scaffold" compound was RD144, so the identity of the compound in the Ouk email has no ambiguity at this point. Dr. Ouk stated in his October 2005 letter, "the biological data of A51 had been tested but Charlie did not reveal its activity to me as usual." (Appx1872). He did not mention

anyone else testing A51. In his November 2005 letter, he wrote,

"Dr. Chen became my sole collaborator in the Sawyers lab [after summer 2004]." (Appx0637). Dr. Ouk further wrote that, in February 2005, he "urgently needed our new compounds be tested," and he felt he must stay on good terms with Dr. Chen. (Appx0639). These written statements by a named inventor in 2005, along with trial testimony from multiple witnesses, show that the district court clearly erred in concluding that the June 22, 2005 email "would not establish that it was Plaintiff who conducted the testing." (Opening Br. at 58; Appx0007).

In a properly done rule of reason analysis, pieces of evidence are connected to each other, and, ideally, everything fits. Here, everything fits. All the contemporaneously generated testing results and laboratory notebook entries prove that the "new scaffold" compound could only be A51. (Opening Br. at 55-57). Dr. Ouk's 2005 letters along with the trial testimonies prove that only Dr. Chen could have generated testing results on A51 and communicated the good results to Dr. Ouk, to enable him to write the smoking gun email to Medivation. (*Id.* at 59). The only testing data without an associated RD number are the CC1 data. Three

days after Dr. Chen generated the CC1 data, Dr. Ouk drew the A51 structure in his laboratory notebook as "parent compound" and started to explore potential analogues using this useful compound as the parent.

For these reasons and the reasons stated in the Opening Brief, Dr. Chen has shown by clear and convincing evidence that he tested A51 in early 2005 and told Dr. Ouk the good testing results, and the district court's finding in this regard was a clear error.

## II. DR. CHEN'S TESTING OF A51 WAS NOT "MERELY CONFIRMATORY," BUT AN IMPORTANT SAR ANALYSIS STEP THAT PROVED THE CANCER FIGHTING PROPERTIES OF A51 AND LED TO THE INVENTION OF THE A-SERIES GENUS OF COMPOUNDS

According to the Defendants-Appellees, Drs. Jung and Ouk "had a rationale for believing that A51 would be a biologically active compound." (Answering Br. at 8). They then set out synthesizing A51. Drs. Sawyers and Jung characterize the first synthesis of A51 as "most difficult." (*Id.*). It took "three months" and involved an explosion of laboratory equipment during the process. (*Id.*). "Nevertheless, the chemists persisted." (*Id.*). Eventually, A51 was successfully synthesized

and Dr. Ouk brought it to Dr. Chen for testing in early February 2005. (*Id.* at 10).

Then, according to Drs. Sawyers and Jung, Dr. Chen told Drs. Ouk and Jung that the pyridine compound was tested but it was not active. (*Id.*). At that point, as the narrative continues, neither Dr. Jung nor Dr. Ouk tried to figure out what went wrong with the chemistry rationale they had before, which purportedly predicted good biological activity from this compound. They did not try to figure out where, maybe, Dr. Chen's testing went wrong, or enlist the help of Dr. Sawyers to test the compound again. Instead, Dr. Ouk simply "turned his attention back to the RD-series." (*Id.*). All the work that went into figuring out the "most difficult" synthesis route for A51 was allowed to go to waste.

The actual actions and inactions described in the *Appellees'* narrative clearly show that Dr. Chen's testing was anything but "merely confirmatory." Drs. Sawyers and Jung's own narrative confirms that, without Dr. Chen's actual testing and reporting of the testing results to them, Drs. Sawyers and Jung would, and did, stop work on any A-series compounds.

The trial evidence shows that, in reality, no one knew beforehand how the biological testing on A51 would turn out based on any general chemistry "rationale" they might have had in early 2005. Dr. Ouk synthesized this new compound containing a new chemical modification (i.e. a pyridine structure), and Dr. Chen tested the new compound and analyzed the test results. The newly acquired information and the accompanying SAR analysis (i.e. how the pyridine structure affects the biological activities) in turn led to the future design and synthesis of a compound (i.e. A52) that also incorporates this pyridine substitution chemical modification, and, further down the line, the drafting of patent claims covering an entire genus of pyridine-containing cancer fighting compounds. Therefore, in addition to showing the cancer fighting properties of A51 itself, which led to the method-of-treatment and pharmaceutical composition claims of A51 in the patents, Dr. Chen's work here was also part of the iterative SAR analysis process that led to the invention of the entire genus of the patented A-series compounds.

Dr. Ouk finally decided to resynthesize A51 after Dr. Chen left UCLA in September 2005. (Appx0003 (the court: "[a]fter Plaintiff's departure, Dr. Ouk resynthesized A51 and synthesized A52.")).

Drs. Sawyers and Jung add to the district court's finding, and state that some incident about a missing NMR spectrum prompted Dr. Ouk's decision in late 2005 to resynthesize A51. (Answering Br. at 12). The trial judge never indicated whether he had found this "missing NMR" story even plausible, and never incorporated any of Dr. Ouk's "missing NMR" testimony into the trial opinion.

In reality, Dr. Ouk learned from Dr. Chen at least before June 22, 2005, that the new pyridine/RD37 combination compound showed encouraging cancer fighting activity. Therefore, Dr. Ouk's decision in late 2005 to synthesize A51 again, and the jotting down of a rationale for why A51 might work in his October 2005 letter to Drs. Sawyers and Jung, do not indicate that he or Dr. Jung had already known the pyridine substitution strategy would work before Dr. Chen's testing of A51. (*See* Opening Br. at 62-63; Appx1872-1873). Quite to the contrary. It is a telling fact that the only person remaining at UCLA at the time who knew A51 *did* work was also the person deciding to resynthesize A51. It was not a coincidence. Dr. Chen's testing of A51 demonstrated that the pyridine substitution strategy worked, and that A51 has utility in fighting cancer and could be patented for use in treating prostate

cancer. Dr. Chen communicated the good results to Dr. Ouk, and these results became the reason for the later resumption of work on A51 and then A52. (Appx1873 ("If A51 is good, one could imagine making [A52]")). As Dr. Ouk further explained in his October 2005 letter, "if A51 turned [out] to be as active as RD37," "there is a big chance" a combination of A51 and RD162, which is A52, "would be as good as RD162." (Appx1872). These are admissions that the design of A52 involved the SAR information obtained from the testing of A51 ("as active as RD37") as well as RD162 (a suitable drug candidate providing the right hand side structure to be combined with pyridine). Thus, Dr. Chen's testing of A51 is not only a significant contribution to the A51 method-of-treatment claims, but also a necessary and essential SAR analysis step that led to the conception and invention of any and all A-series compounds beyond A51 itself.

III. **DR. CHEN'S LUCIFERASE REPORTER-BASED CELL SYSTEM AND THE TESTING PARAMETERS HE DEVELOPED WERE INNOVATIVE, INTEGRAL TO THE JOINT EFFORT THAT LED TO THE A-SERIES COMPOUNDS, AND NOT PUBLICLY AVAILABLE AT THE RELEVANT TIME**

A. **The Trial Record Is Clear That Dr. Chen's Testing System and Assay Parameters Were Innovative and Not Publicly Available until More Than One Year after A51 and A52 Were Invented**

Dr. Chen set forth a detailed analysis to show clearly and convincingly that his innovative and specialized luciferase reporter-based cell system was not published or made publicly available until more than one year *after* the invention of A51 and A52. (Opening Br. at 10-12, 34-39). In arguing to the contrary, Drs. Sawyers and Jung unfortunately rely on a few glaring distortions of the trial record.

First, after Drs. Sawyers and Jung point out correctly that the testing system in question is described in the RD-series patents, they state that "[t]hese patents are not in the record." (Answering Br. at 45). One of the RD-series patents is in the record, and it clearly shows that the patent application was published on January 4, 2007, more than one year after the Invention Report relating to the A-series compounds

was drafted and signed by Drs. Jung, Sawyers and Ouk. (Appx0541, 1868-1871).

Drs. Sawyers and Jung then point to Dr. Sawyers' trial testimony for the proposition that "*the testing system* was publicly known [in early 2005]." (Answering Br. at 45) (emphasis added). Dr. Sawyers actually testified that "a skilled biologist," in "many weeks, if not months," "could design *a system*," and "would be able to" make *the cell lines* (part of the testing system). (Appx0459-0460) (emphasis added). Dr. Sawyers then agreed with his counsel that, once that trained and skilled molecular biologist made their own version of LNCaP AR cells, they would be able to test compounds for androgen receptor activity "*based on* the *Nature Medicine* article." (Appx0461) (first italics added). Nowhere did Dr. Sawyers testify that "the testing system" Dr. Chen built for the drug discovery project was publicly available in 2005. Never once. Dr. Sawyers only testified that someone could have built "a system" after many weeks, if not months, of work, which could be used to run testing "based on" prior art information. When expressing these opinions at trial, Dr. Sawyers said nothing about just how difficult it would be for "a skilled biologist" to do all this, or how reliable and

efficient the resulting system would be for the testing. Similarly, he never addressed the skill level and difficulties that would be involved in developing a goldilocks set of testing parameters, which Dr. Chen did in ten months, to make the testing reliable and efficient and the drug discovery process practical. (*See* Opening Br. at 38-39). Dr. Sawyers never once said that any of these efforts would have been routine based on the prior art.

Even the trial opinion was not immune to distortion by Appellees. After stating that "the testing system was publicly known at the time Dr. Chen allegedly used it to test A51," Drs. Sawyers and Jung cite to the trial opinion. (Answering Br. at 45 (citing to Apx0007); *see also id.* at 47 ("In other words, the District Court found from the evidence at trial that the testing system Dr. Chen cited as his contribution to the A-series Patents was actually publicly known as of February 2005")). In reality, the court below never found that the *luciferase reporter*-based cell system Dr. Chen developed and used was publicly known in 2005. The court found that the RD-series patents contained a description of the luciferase reporter-based cell system Dr. Chen built, and, therefore, the court deemed this cell system "not developed specifically to test the

A-series compounds, but to test the RD-series compounds." (Appx0007).

The court went on to say, "Plaintiff has offered no independent, contemporaneous corroborating evidence that he developed a *PSA ELISA* study to test the A-series Compounds. To the contrary, Dr. Sawyers offered expert testimony that the *PSA ELISA* study cited by Plaintiff was publicly known by 2005." (*Id.*) (emphasis added). The "PSA ELISA study" is neither the cell system nor the testing parameters Dr. Chen developed. Thus, throughout their Answering Brief, Drs. Sawyers and Jung improperly use the phrase "<u>the</u> testing system" to include "<u>a</u> testing system" that is not the actual system Dr. Chen developed, and conflate Dr. Chen's luciferase reporter-based cell system and testing parameters with other types of testing, such as the PSA ELISA study.

Finally, Drs. Sawyers and Jung distort Dr. Chen's trial testimony. They portray Dr. Chen's testimony as an "admission" that the cell lines he used to generate the CC1 data, "the luciferase reporter he used in the 'CC1' testing," and "these in vitro tests" were previously disclosed, "off the shelf," or "just a regular test." (Answering Br. at 48-49 (citing to Appx0262-0264)). Dr. Chen made no such admissions. He testified that

the cell lines he used were not published anywhere as of February 2005, and they contained both androgen receptor DNA vector and a luciferase reporter gene, which were not present in the cell line disclosed in the Nature Medicine paper. (Appx0290-0291). Dr. Chen testified about how he spent months developing a cell line suitable for the drug discovery work. (*See*, *e.g.*, Opening Br. at 34-35 (citing to Appx0177, 0179, 0181, 0185-0186)). After the cell line was developed, Dr. Chen spent ten more months improving the testing parameters and arriving at a set of parameters that did not exist in the prior art. (Opening Br. at 35 (citing to Appx0179-0181)).

Drs. Sawyers and Jung point to Appx0264 for support. However, the transcript records Dr. Chen testifying that, for the cell system tests, the "[m]easurement is the same," but "the system you have [was] different." (Appx0264 (lines 9-12)). On re-direct, Dr. Chen used a car analogy to illustrate the difference between the measurement of a signal (luciferase activity or potentially PSA level) and the development of a test system and a set of testing parameters used to generate that signal.

Q: Dr. Chen, earlier you were testifying about something that can be bought off the shelf to test luciferase or test PSA. Do you remember talking about that?

A: Yes.

Q: So if we compare your testing system, the cell line that you built, like a race car and the . . . would you compare the kit that you can buy off the shelf as a radar gun that can detect how fast the car is going?

A: Yes.

Q: Okay. So the radar gun was available commercially but not the car that you specially built?

A: Correct. I build car, airplane, rocket.

(Appx0291-0292). The "car, airplane, rocket" Dr. Chen built, and the information gathering, analysis, and adjustment of course he performed as he drove or piloted the vehicle, took the drug discovery project to the promised land, not the "off the shelf" radar gun that measured how fast the vehicle was going.

## B. It Was Clear Error to Discount the Role Dr. Chen's Innovative, Reliable, and Efficient Testing System and Methods Played in the Invention Process of the A-Series Compounds

The trial record shows, clearly and convincingly, that Dr. Chen's testing system and methods were innovative and not publicly available, and the testing was not "confirmatory" in nature, but a necessary, important, and integral part of the SAR analysis and drug discovery

process that led to the invention of the A-series compounds. (Opening Br. at 34-48, 59-73).

In Argument III of the Answering Brief, Appellees argue that "Dr. Chen's development and use of the testing system had no bearing on the invention of the compounds claimed in the A-series Patents . . . ." (Answering Br. at 46). They did not cite to the trial record to substantiate this conclusion. The testing and the SAR analysis Dr. Chen conducted were used to develop and select the right hand side cancer inhibiting structures for combination with the pyridine structure on the left. (*See* Opening Br. at 60-64). Furthermore, his testing of A51 proved that the pyridine substitution worked, which showed the way for future combination of the pyridine structure with a better cancer fighting right hand side structure. (*Id.*). Therefore, Dr. Chen's work in developing and using the testing system did contribute to the *structures* as well as the use of the A-series compounds in cancer treatment, including those of A51 and A52.

Drs. Sawyers and Jung try to limit the application of *Falana* to just "a method of making any compounds claimed in the A-series Patents." (Answering Br. at 45-46 (citing to *Falana v. Kent State Univ.*,

669 F.3d 1349 (Fed. Cir. 2012) and Opening Br. at 42-43)). The district court did not go that far. The court discounted Dr. Chen's "luciferase reporter system" not because it was not "a method of making any compounds," but because it "was not developed specifically to test the A-series compounds." (Appx0007). In the Opening Brief, Dr. Chen relied on *Falana* for the proposition that the development of the testing system amounted to a significant contribution to *both* the RD-series patents and the A-series patents. (Opening Br. at 41-48). The court below deemed the RD-series compounds and the A-series compounds conceptually and chemically distinct set[s] of compounds. However, the invention *processes* for both sets of compounds were not "conceptually and chemically distinct," and can even be viewed as one and the same, involving the same SAR analysis. (*Id.*). In this regard, *Falana* is directly on point. Even though the chemical compound Dr. Falana synthesized and the one his colleague later synthesized and patented after his departure from the team were "distinct," Dr. Falana's significant contribution applied to both compounds to qualify him for joint inventorship. Dr. Chen's reliance on *Falana* is proper in demonstrating where the trial court went wrong. It was legal error to require that Dr.

Chen's test system be "specific" to the A-series compounds, or that it not

have been included in any non-A-series patent application.

## IV. DR. CHEN'S TESTING AND SAR ANALYSIS WAS A SIGNIFICANT CONTRIBUTION TO THE INVENTION OF BOTH THE RD-SERIES AND THE A-SERIES COMPOUNDS

### A. Appellees Admit Dr. Chen Was an Active Member of the Team That Invented Numerous Cancer Fighting Chemical Compounds Including RD37 and RD162 through Iterative SAR Analysis and Chemical Compound Design

The right hand side structures of A51 and A52 were not the

product of a single stroke of genius, or happened upon by the named

inventors out of some extraordinary luck. Instead, these structures,

which first appeared in RD37 and RD162, were the result of a multi-

year process of innovative and painstaking system building, careful

testing and voluminous data collection, and, most importantly, step-by-

step, iterative SAR analysis by a team of talented scientists including

Dr. Chen. (*See*, *e.g.*, Opening Br. at 9-18). As Dr. Chen explained in his

Opening Brief, the SAR analysis informed and helped refine the design

of the right hand side structures of all of the 175 RD-numbered

compounds and led to the invention of RD37 and RD162, which contain

essential features of A51 and A52, respectively. (*Id.* at 34-48, 65-73).

The Answering Brief by Drs. Sawyers and Jung also describes "the drug discovery process for the first series of compounds, called the 'RD-series Compounds.'" (Answering Br. at 4-5). In their narrative, Drs. Sawyers and Jung admit:

- Dr. Chen was part of "the team of chemists and biologists" who conducted "active collaboration and joint analysis . . . throughout the RD-series project." (*Id.*).

- The "data and discussions" within the team led them to "generate[] new compounds." (*Id.* at 5).

- Dr. Chen "actively participated in these SAR meetings and group discussions about the test results, and analyzed the SAR after test results were obtained." (*Id.*).

- This SAR analysis process involved "iterative and collaborative discussions between the chemists and biologists, such as Dr. Chen." (*Id.* at 17).

- The drug discovery group's joint work led to the patents that "cover the RD-series Compounds" including RD37 and RD162. (*Id.* at 5).

These now agreed-to facts regarding Dr. Chen's SAR analysis work at UCLA are important for evaluating Dr. Chen's contribution to the invention of A51 and A52. Because "the law requires only that a co-inventor make a contribution to the subject matter of a claim," these now agreed-to facts are sufficient to show that the district court erred as a matter of law to refuse to grant Dr. Chen joint inventorship on the

A-series patents. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1361-62 (Fed. Cir 2004).

### B. Drs. Sawyers and Jung Agree with Dr. Chen that an A-Series Compound Is a Combination of Parts, Including a Left Hand Side Pyridine Structure and a Right Hand Side Aryl Structure

Using a "key" analogy, Dr. Chen explained why his inventive work leading to RD162 and his testing of the first pyridine-containing compound derived from RD37 amounted to significant contributions to the invention of A52, which contains the same right hand side structure as RD162. (Opening Br. at 71-72). In this view, the A52 structure is a combination of a left side "bow" (a binding module) and a right side "blade" (the business end of cancer inhibition). (*Id.*).

Drs. Sawyers and Jung agree with Dr. Chen's view that an A-Series chemical compound is a *combination* of several parts. (Answering Br. at 21 (the A-series Compounds came from "the inventive decision to combine a left-hand pyridine ring with a central spirocyclic thiohydantoin and a right-hand aryl ring.")). This view is consistent with both the structures and the invention process of the A-series compounds. As a matter of chemical structure, A51 and A52 contain these parts that could be recognized and identified separately, as

Drs. Sawyers and Jung did at trial and in their Answering Brief. (*Id.*).

Historically, the identification of a specific cancer-inhibiting right hand side structure (from RD37 or RD162) preceded the attachment of a left hand side pyridine structure to it (to make A51 and A52). For A52, everyone agrees that the left hand side pyridine structure was conceptualized many months before the right hand side structure of RD162 was invented and deemed suitable for cancer inhibition. (Answering Br. at 8 (first synthesis of A51 in January of 2005); Appx1589 (RD162 structure shown in a July 8, 2005 entry in Dr. Chen's laboratory notebook)). For A51 and A52, their respective left hand side structures and right hand side structures were conceptualized and developed separately, at different times, and then combined.

This agreed-upon view of A52 as a modular combination of distinct parts further supports Dr. Chen's argument that, because he significantly contributed to at least one important part of the patented subject matter, he should have been a co-inventor on the A-series patents. *See Ethicon, Inc.*, 135 F.3d at 1461-62 (contribution to "part of the invention" can be sufficient for joint inventorship). It was legal error for the district court to hold "identifying RD37 and RD162 as the lead

compounds for A51 and A52" irrelevant or insignificant to the invention of A51 and A52. (Appx0006).

### C. Drs. Sawyers and Jung Admitted at Trial that the Invention of the A-Series Compounds Involved the SAR Analysis Conducted by Dr. Chen

Dr. Sawyers and Jung attempt to recast the invention process of the A-series compounds into a single "inventive or eureka moment of replacing the benzene ring with a pyridine ring." (Answering Br. at 16). They argue that "the conception of both A51 and A52 did not involve a SAR process or iterative and collaborative discussions [involving Dr. Chen]." (*Id.* at 17). However, as mentioned above, they also admit that "a pyridine ring," by itself, is just one-third of an A-series compound, and a specific "right-hand aryl ring" is also required for the conceptualization of any A-series compound. In this context, neither "the benzene ring" to be replaced, nor "a pyridine ring," is a free-floating object that could be manipulated or patented. Such a "ring" must be attached to a specific right hand side structure to make a novel and useful chemical compound. The design of the right hand side structure of each RD- or A-series compound involved the SAR analysis on

preceding RD-named compounds conducted by Dr. Chen as part of the team. (Appx0424).

In their Answering Brief, Drs. Sawyers and Jung completely fail to describe the process that led to the design of the right hand side structures of A51 and A52. For example, they avoid any reference to the July 2005 email discussion between themselves regarding Dr. Chen's identification of RD162 as the best compound having the most promising cancer fighting properties. (Appx0661-0662). They avoid mentioning Dr. Sawyers' trial testimony that "some of the SAR was useful in picking a compound for doing the pyridine ring." (Opening Br. at 69 (citing to Appx0467)). They also avoid discussing Dr. Jung's trial testimony that, once he knew RD162 was quite good, it would be "a natural thing" to combine parts of it with a left-hand pyridine to make A52. (*Id.* (citing to Appx0439-0440)). Drs. Sawyers and Jung have nothing to say in their brief after each has admitted at trial that, one, the SAR analysis done by Dr. Chen did inform the selection of the right hand side structures of A51 and A52, and, two, the right hand side structure of A52 specifically came from the SAR analysis of RD162, which was conducted by Dr. Chen.

### D. It Is Clearly Erroneous to Equate the Conception of the A-Series Compounds to "the Innovative Decisions to Combine"—the Conception Also Included the Identification of Specific Parts to Combine, to Which Dr. Chen Made Significant Contributions

In their Argument IV, Drs. Sawyers and Jung state, "[t]he conception of the A-series Compounds involved the innovative decisions to combine the left-hand pyridine ring with a central spirocyclic thiohydantoin and a right-hand aryl ring." (Answering Br. at 50). They argue that Dr. Chen, at most, only identified "lead compounds for A51 and A52," or an "inspiration." (*Id.* at 50, 52). In their Argument V, Appellees characterize Dr. Chen's work as "but for" causation, and "[un]tethered to any particular claim of the three A-series patents." (*Id.* at 56). These views ignore the actual invention process for the A-series compounds, and are clearly erroneous.

Here, the general idea of making pyridine-containing compounds was formed in late 2004, reflected in the synthesis of A51, and tested in early 2005 by Dr. Chen and found to be viable. However, the invention process for the A-series patents did not stop there. RD37 and by extension A51 was deemed unsatisfactory as a drug candidate because of poor pharmacokinetic properties, so several more months of work

were carried out by Dr. Chen and Dr. Ouk to design, synthesize, test, and identify the right hand side structure that has both good cancer inhibiting and pharmacokinetic properties. (*See*, *e.g.*, Opening Br. at 14-15, 71-72; *see also* Answering Br. at 10 (Dr. Ouk "turned his attention back to the RD-series" after Dr. Chen's testing of A51)). There might have been a decision to combine pyridine and other structures in 2004 or early 2005, but to combine with what other structures exactly? No specific right hand side structure was available to make a good drug candidate, until Dr. Chen first carried out more SAR analysis along with other team members to zero in on the structure of RD162, and finally identified RD162 in July 2005 as "the best." The A-series patents cover subject matter that went beyond the mere idea to combine or the synthesis of A51 itself, and reached A52 and its use in treating cancer. For these latter, important, parts of the claimed subject matter, Dr. Chen supplied far more than just a "lead compound," an "inspiration," or a "but for" causation. He supplied the specific part of the structure of a specifically claimed chemical compound that solved the problem at hand.

It is wrong to view RD162 as a "lead compound" for A52. Dr. Chen identified RD162 as the best drug candidate. The pyridine structure was included in A52 for patentability purposes, not to solve any technical problem at hand. (Opening Br. at 69-70). If one must point to a "lead compound" for A52, A51 fits the description, and RD162 provided the right hand side structure, the modification that addressed A51's problem with poor pharmacokinetics.

Here, a pyridine-containing framework was set up before the desirable structure (A52) was invented using a step-by-step SAR analysis process that finally reached RD162 in July 2005. When Dr. Chen told Drs. Sawyers and Jung, "RD162 is the best," a solution to the pharmacokinectics problem was found. (Appx0661-0662). The structure to be filled into the preexisting pyridine-containing framework was set at that moment, and it makes *no* sense to deprive Dr. Chen of joint inventorship just because he did not say the magic words, "now let's put this good structure into the pyridine framework, which we already knew would probably work from my testing of A51." Such a holding would be contrary to this Court's precedent. To require a joint inventor to articulate all parts of a claimed chemical compound

would, in effect, "obviate the concept of joint invention" for a chemical compound patent. *Fina Oil and Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997). This is especially true when the structural framework had been set before a specific right hand side structure was identified, and all that was left to do was "a natural thing" of combining these selected parts. (Appx0439-0440). For at least these reasons, Dr. Chen is a co-inventor of the A-series patents based on the actual invention process.

Drs. Sawyers and Jung's discussion of *American Bioscience* and *Aradigm Corp.* is, therefore, not applicable to the facts here. (Answering Br. at 53). Neither case addresses the inventive contribution of someone who identified the last piece of the puzzle that would fit in a preexisting framework.

Finally, Dr. Chen did not waive the argument that he supplied the structures for A51 and A52. (Answering Br. at 54). For example, Dr. Chen proposed post-trial findings that he "spent a year on solving RD37's PK problem," "proposed specific changes to the right-hand structure of RD37 to make it more stable," "conducted SAR analysis," and "identified RD162 as the best compound." (Appx2178, at ¶¶ 19-20).

Dr. Chen further proposed that, "[o]nce Drs. Ouk and Jung knew RD162 was good, it was natural to combine with the pyridine structure, and that would make A52." (*Id.* at ¶ 20). Dr. Chen has been consistent in his arguments.

## CONCLUSION

For the foregoing reasons and the reasons stated in his Opening Brief, Dr. Chen respectfully requests that this Court reverse the judgment below and hold that Dr. Chen is a joint inventor of U.S. Patent Nos. 8,445,507, 8,802,689, and 9,388,159, and Order the Patent Office to correct the inventorship accordingly.

Date: April 15, 2020

Respectfully submitted,

/s/ Yixin H. Tang
Shashank Upadhye
Yixin H. Tang
Brent A. Batzer
UPADHYE CWIK LLP
135 S. LaSalle Street, Suite 1930
Chicago, IL 60603
T: (312) 598-2610

*Counsel for Plaintiff-Appellant*
*Degui Chen, Ph.D.*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of April, 2020, I caused this

Reply Brief of Appellant to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

Emily Kuwahara
Crowell and Moring LLP
515 S Flower Street, 40th Floor
Los Angeles, California  90071
(213) 443-5556
ekuwahara@crowell.com

Chiemi Suzuki
Crowell and Moring LLP
590 Madison Avenue, 20th Floor
New York, New York  10022
(212) 223-4000
csuzuki@crowell.com

Gabriel M. Ramsey
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, California  94025
(650) 614-7400
gramsey@crowell.com

*Counsel for Defendants-Appellees*

/s/ Yixin H. Tang
*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [*6,955*] words.

    [    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.  This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Century Schoolbook*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>April 15, 2020</u>          <u>/s/ Yixin H. Tang</u>
                                       *Counsel for Plaintiff-Appellant*